74 A.3d 1013

IN THE MATTER OF THE MINOR CHILDREN J.E. AND J.C.

Superior Court of New Jersey
Chancery Division Atlantic County

Argued April 19, 2013—Decided August 9, 2013.

*Roberto A. Rivera–Soto, Michael R. Carroll,* and *Christopher N. Tomlin* for petitioner, M.B.G. and the minor children J.E. and J.C. (*Ballard Spahr, LLP,* attorneys).

MENDEZ, A.J.S.C.

On March 22, 2013, M.B.G. ("petitioner") filed an emergent action seeking an order setting forth special findings as antecedent to the application by her minor sons, J.E. and J.C.,[1] for Special Immigrant Juvenile Status ("SIJS") under 8 *U.S.C.A.* § 1101(a)(27)(J) and 8 *C.F.R.* § 204.11. Petitioner also seeks an order of custody.

The core issue presented is whether there is a sufficient basis for the court to exercise jurisdiction to make special findings antecedent to an application for SIJS, pursuant to 8 *U.S.C.A.*

---

[1] The initials of the names of the petitioner, minor children, and all other relevant persons in this case are used to protect their privacy. *See, e.g., N.J. Div. of Youth & Family Servs. v. R.D.,* 207 *N.J.* 88, 94 n. 1, 23 *A.*3d 352 (2011); *N.J. Div. of Youth & Family Servs. v. I.S.,* 202 *N.J.* 145, 151 n. 1, 996 *A.*2d 986 (2010).

§ 1101(a)(27)(J) and 8 *C.F.R.* § 204.11, when the children already are in a safe placement with petitioner. For the reasons placed on the record and as outlined below, the court grants petitioner custody of her two minor sons, J.E. and J.C. The court also makes the special findings needed for the boys to qualify for SIJS, allowing them to petition the United States Customs and Immigration Services for SIJS pursuant to 8 *U.S.C.A.* § 1101(a)(27)(J) and 8 *C.F.R.* § 204.11.

## I.

### *Facts and Procedural Background*

Based on the verified representations made in the petition and the proofs adduced in the hearing conducted in this matter, the court makes the following findings of fact. Petitioner is the biological mother of her minor sons, J.E. and J.C. Petitioner is a citizen of El Salvador and her two sons are citizens of Honduras. Petitioner arrived in the United States sometime in 2000 and has resided in Hammonton, Atlantic County, New Jersey continuously since then. Petitioner was first granted Temporary Protected Status ("TPS") in the United States on February 5, 2002, and she has obtained an extension of her TPS on an annual basis. Petitioner's current TPS is set to expire on September 9, 2013; unless her TPS is extended once again, she will have no lawful basis to remain in the United States past its expiration date.

In the late 1990's, petitioner was residing in Honduras. She eventually married J.E.S.H., a citizen of Honduras, and, from that union, J.E. and J.C. were born, also in Honduras. Petitioner's minor sons J.E. and J.C. are presently sixteen and fifteen years old, respectively; J.E. was born in 1996, and his younger brother J.C. was born in 1997. Petitioner's marriage to J.E.S.H. was less than ideal, resulting in their separation when the boys were less than four years old.

Immediately following petitioner's separation from her husband, she stayed in Honduras with her mother and sister. During this

time, petitioner had legal custody of J.E. and J.C. She testified concerning one particularly frightening incident where her husband tried to kill her; he thrice shot at her, fortunately, without striking her, because she refused to allow him to take J.E. and J.C. from her. Fearing for her life, petitioner fled Honduras without her two sons. She entered the United States sometime during the year 2000.

J.E. and J.C. remained in Honduras with their father and, later, their stepmother, M.D.H ("stepmother"). After arriving in the United States, petitioner applied for TPS on June 8, 2001, and was granted temporary status on February 5, 2002. She now resides with her boyfriend, with whom she has a ten year old daughter, along with her two sons J.E. and J.C., in Hammonton, Atlantic County, New Jersey.

The boys' life in Honduras with their father and stepmother was brutal. J.E. testified that his stepmother would routinely beat him and his brother J.C., using belts, cables, sticks, and her bare hands. Those beatings left marks and bruises. He testified that his father did nothing to protect him and his brother from this abuse. The children provided compelling testimony about their father's involvement in drug trafficking and how their father made no effort to shield them from his criminal activity. Their father often would engage J.E. to deposit large, unexplained sums of money in the bank. Both boys routinely witnessed their father and his associates with large arsenals of guns, and witnessed a large container with a white substance being stored in their father's house.

The boys' father was shot and killed by his enemies/associates on May 10, 2011, during a shoot-out also involving the police and other drug traffickers.[2] The police arrested several of the drug

---

[2] Petitioner testified that she was not aware of her husband's criminal activity until she was informed that he had been murdered. She testified that her mother and sister, who still lived in Honduras, contacted her with the news of

traffickers who killed the boys' father. On the heels of J.E.S.H.'s murder, the boys' stepmother fled out of fear that she was in danger, leaving the boys behind. The boys telephoned their mother, petitioner, and she made arrangements for the boys to hide at their aunt's house, where they remained in hiding for some fifteen to twenty days.

The reason for these precautions was palpable: their father's enemies knew who the boys were and, to some extent, where they could be found. The boys explained that, in order to silence them as possible witnesses and because the drug traffickers likely believed that the boys might one day seek revenge for their father's death, the boys reasonably feared that they also would be killed if the drug traffickers discovered their location. J.E. and J.C. testified that, while in hiding at their aunt's house, they regularly would see a vehicle belonging to one of their father's enemies parked outside. The boys provided credible testimony that they are afraid for their lives if they return to Honduras.

In order to keep the boys safe, petitioner and her family in Honduras arranged for the boys to leave Honduras and be taken to Guatemala; the family engaged the services of a "coyote," that is, someone engaged in the business of smuggling persons across borders.[3] J.E. and J.C. fled Honduras in August 2011, seeking ultimately to reunite with their mother in the United States. Once they arrived in Guatemala, they were abandoned by the "coyote" and left to their own devices. The boys—then ages thirteen and fourteen—made the remainder of their two-week trip to the United States by themselves, sleeping in bus terminals when they could and generally making do. On or about September 8, 2011, the boys entered the United States by way of Texas,

---

his death, and that she read about his murder while in the United States in a local Honduras-based newspaper.

[3] See Merriam–Webster Dictionary Online (11th ed. 2013), available at http://www.merriam-webster.com/dictionary/coyote (also defining "coyote" as "one who smuggles immigrants into the United States").

after traveling primarily by bus through Guatemala and Mexico. Upon arriving in the United States, the boys surrendered themselves to the immigration authorities, and were remanded to a juvenile facility in Houston, Texas for approximately two months. The boys ultimately were released to petitioner's custody in Hammonton, New Jersey on October 28, 2011; the immigration authorities determined it would be best that the boys be placed with their mother, petitioner, who already was in this country under a TPS, a crucial fact in this case.

The boys have resided safely with petitioner, her boyfriend, and the boys' half-sister since October 28, 2011. Both boys are attending school, learning the English language, and thriving. Their current status in the United States is undocumented, and they are seeking SIJS in order to obtain legal resident status in the United States. They have expressed the strong desire not to be returned to Honduras, and to remain with petitioner.

On March 22, 2013, petitioner filed her petition, seeking the special findings needed for a later application for SIJS as well as for a custody determination. On April 8, 2013, the court conducted a plenary hearing on that application and, via an interpreter, received the testimony of petitioner and the boys, as well as some additional documentary proofs. At the close of the hearing, the court entered its findings and conclusions on the record. This opinion, memorializing those findings and conclusions, followed.

## II.

### *Analysis, Special Findings and Conclusions*

### A.

### *Special Juvenile Immigration Status under*
### *the Immigration and Nationality Act*

"The Immigration and Nationality Act, 8 *U.S.C.A.* § 1101(a)(27)(J) (2006); 8 *C.F.R.* § 204.11 (2008), gives undocumented children, under the jurisdiction of a juvenile court, the ability to petition for special immigrant juvenile status in order to

obtain lawful permanent residence in the United States." *D.C. v. A.B.C.,* 417 *N.J.Super.* 41, 45–46, 8 *A.*3d 260 (Ch.Div.2010).[4] The decision to confer the SIJS classification on eligible aliens "show[s] a congressional intent to assist a limited group of abused children to remain safely in the country with a means to apply for [lawful permanent resident] status." *Garcia v. Holder,* 659 *F.*3d 1261, 1271 (9th Cir.2011).

A "special immigrant" is defined statutorily as an "immigrant who is present in the United States" and

(i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;

(ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and

(iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status, except that—

(I) no juvenile court has jurisdiction to determine the custody status or placement of an alien in the custody of the Secretary of Health and Human Services unless the Secretary of Health and Human Services specifically consents to such jurisdiction; and

(II) no natural parent or prior adoptive parent of any alien provided special immigrant status under this subparagraph shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this Act;

[8 *U.S.C.A.* § 1101(a)(27)(J).]

In order to be eligible for special immigrant status, the requirements of 8 *C.F.R.* § 204.11(c)[5] also must be met. *D.C., supra,* 417

---

[4] In an unpublished opinion, the Appellate Division affirmed the Chancery Division's judgment in *D.C., supra,* 417 *N.J.Super.* 41, 8 *A.*3d 260. *See M.P.C. v. A.B.C.,* Docket No. A–4082–10, 2012 *WL* 1205805 (App.Div. Apr. 12, 2012). However, because *Rule* 1:36–3 provides that "[n]o unpublished decision shall constitute precedent or be binding upon any court" and "no unpublished opinion shall be cited by any court[,]" all references shall be limited to the published Chancery Division opinion.

[5] As noted in other respects later in this opinion, 8 *U.S.C.A.* § 1101(a)(27)(J)(i) originally required that reunification with both parents could not be viable; in

*N.J.Super.* at 46, 8 *A.*3d 260. Therefore, under the relevant portions of the Immigration and Nationality Act, state juvenile courts must make a preliminary determination of the child's dependency and his or her best interests, which is a prerequisite to an application to adjust status as a special immigrant juvenile. The federal government, under its exclusive jurisdiction over matters of immigration, then makes the final determination on conferring special juvenile immigrant status.

■  An alien's eligibility for classification as a special immigrant under 8 *U.S.C.A.* § 1101(a)(27)(J) is determined by satisfaction of the following relevant criteria:

(1) Is under twenty-one years of age;

(2) Is unmarried;

(3) Has been declared dependent upon a juvenile court located in the United States in accordance with state law governing such declarations of dependency, while the alien was in the United States and under the jurisdiction of the court;

.    .    .    .    .    .    .    .

(6) Has been the subject of judicial proceedings or administrative proceedings authorized or recognized by the juvenile court in which it has been determined that it would not be in the alien's best interest to be returned to the country of nationality or last habitual residence of the beneficiary or his or her parent or parents; or

(7) On November 29, 1990, met all the eligibility requirements for special immigrant juvenile status in paragraphs (c)(1) through (c)(6) of this section, and for whom a petition for classification as a special immigrant juvenile is filed on Form I–360 before June 1, 1994.

[8 *C.F.R.* § 204.11(c).]

J.E. was born in 1996 and his younger brother J.C. was born in 1997. Therefore, the minors are both under twenty-one years of age, and the court finds as a fact that they are both unmarried.

---

2008, the statute was amended to provide instead that "reunification with *1 or both* of the immigrant's parents is not viable[.]" (emphasis supplied) (amending *8 U.S.C.A.* § 1101(a)(27)(J)(i) (2006)). That said, its implementing regulation, 8 *C.F.R.* § 204.11, has not kept pace. Accordingly, those portions of the regulation that conflict with the current statute are no longer valid. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 *U.S.* 837, 842–44, 104 *S.Ct.* 2778, 2781–82, 81 *L.Ed.*2d 694, 703–04 (1984) (that agency regulations implementing federal statutes generally controlling unless are contrary to the statute).

Accordingly, the minors satisfy the first two subsections under 8 *C.F.R.* § 204.11(c). *See* 8 *C.F.R.* § 204.11(c)(1)-(2). We turn, then, to the remaining requirements under the statute.

This statutory scheme has not remained static; 8 *U.S.C.A.* § 1101(a)(27)(J) has evolved via amendments adopted by Congress in 1997 and 2008. *See U.S.C.A.* § 1101(a)(27)(J) (amending *U.S.C.A.* § 1101(a)(27)(J) (2006)). The former statutory requirement that a child be deemed eligible for long-term foster care, envisions that a dependency determination would occur in the context of a child protection proceeding. As a result of the removal of the foster care requirement, state courts may now make SIJS findings whenever jurisdiction can be exercised under state law to make care and custody determinations, and are no longer confined to child protection proceedings alone.

The court concludes that, by removing any foster care placement or involvement of a child protection agency, Congress intended to expand the pool of eligible children who may qualify for SIJS. In New Jersey, a petition for SIJS may be filed both under a Children in Court docket, initiated by the child protection agency, or, as here, a petition filed by a parent or guardian under a "FD" non-dissolution docket.

### B.

#### *The Court's Jurisdiction to Determine this Application*

A fair and proper analysis must start with determining whether the children in fact are dependent on the court, as required by 8 *U.S.C.A.* § 1101(a)(27)(J)(i) and 8 *C.F.R.* § 204.11(c)(3). The court is vested with the power to exercise jurisdiction over J.E. and J.C. on the basis of its *parens patriae* jurisdiction, that is, the power of the sovereign to watch over the interests of those who are unable to protect themselves. *Black's Law Dictionary* 1221 (9th ed. 2009). The common law doctrine of *parens patriae* imposes on the State the affirmative duty to protect the interests of minor children. *See* 2 Gary N. Skoloff & Lawrence J. Cutler, *N.J.*

*Family Law Practice,* § 4.1A at 4:3 (11th ed. 2003). "Particularly as *parens patriae,* the state has a long established interest in the protection of children." *Pelow v. Pelow,* 300 *N.J.Super.* 634, 639, 693 *A.*2d 564 (Ch.Div.1996) (*citing Lippincott v. Lippincott,* 97 *N.J. Eq.* 517, 519–21, 128 *A.* 254 (E. & A.1925)). Therefore, the rights of a family are "tempered by the State's *parens patriae* responsibility to protect the welfare of children." *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 347, 736 *A.*2d 1246 (1999) (*citing In re Guardianship of J.C.,* 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992)). The welfare and the best interest of the children are always paramount. *In re Baby M.,* 217 *N.J.Super.* 313, 323, 525 *A.*2d 1128 (Ch.Div.1987), *rev'd on other grounds,* 109 *N.J.* 396, 537 *A.*2d 1227 (1988).

The court concludes that it can exercise jurisdiction over the minor children J.E. and J.C. by invoking its longstanding *parens patriae* power to protect their interests by sheltering them from harm. Under normal circumstances, the court would be reluctant to take jurisdiction in a case where, as here, the children are in a safe placement with one of their natural parents. This case is different. The children were placed with petitioner by immigration authorities and that placement triggers the need for the court's supervision of that placement to make certain that the children are safe and well taken care of. Of greater significance, it is the duty of the court, under its *parens patriae* power, to ensure that the children have safety and stability. The necessary conclusion is as stark as it is simple: the court cannot turn its back on J.E. and J.C. when the failure to take jurisdiction over them eventually could lead to the boys returning to Honduras to face what are likely, if not certain, tragic consequences.

Likewise, *N.J.S.A.* 9:2–3 provides a statutory jurisdictional basis to vest the court with jurisdiction to determine custody proceedings, particularly in the circumstances presented in this case. To review, the children were in the custody of their father for some ten years followed by the temporary custody of immigration authorities, until the children were placed with petitioner. There

is, therefore, an appropriate basis to determine custody under *N.J.S.A.* 9:2–3, and a court order is necessary to re-affirm the de facto custody petitioner presently exercises over the boys. The court thus concludes that the children are dependent on the court, as required by 8 *U.S.C.A.* § 1101(a)(27)(J)(i) and 8 *C.F.R.* § 204.11(c)(3).

## C.

### *SIJS Predicate Findings*

■ Next, the remaining findings that must be made antecedent to an application for SIJS must be addressed. They are:

> For a juvenile to qualify for special immigrant juvenile status, a court must find that reunification of the juvenile with one or both of the juvenile's parents is not viable due to parental abuse, neglect, abandonment, or similar parental conduct defined under state law, and that it would not be in the juvenile's best interest to be returned to his or her native country or country of last habitual residence. [*D.C., supra,* 417 *N.J.Super.* at 51, 8 *A.*3d 260 (citing 8 *U.S.C.A.* § 1101(a)(27)(J)(i) & (ii); 8 *C.F.R.* § 204.11(c)(6)).]

The court concludes that, under 8 *U.S.C.A.* § 1101(a)(27)(J)(i), the relevant inquiry is whether reunification with either parent is viable. Stated differently, if reunification with one parent is not viable, even when reunification with the other parent is, the applicant nevertheless qualifies for eligibility for SIJS.

Only one New Jersey published opinion, *D.C., supra,* 417 *N.J.Super.* at 41, 8 *A.*3d 260 addresses the eligibility of an applicant for SIJS in the context of the prerequisite SIJS findings, and its reasoning is consistent with the analysis applied here. In *D.C.,* the stepmother of a minor child filed an application for custody. The minor, originally from Guatemala, had entered the United States illegally at the age of fourteen years because his natural mother in Guatemala—herself a fit parent—thought it best that the minor live with his father—also a fit parent—in the United States. In the context of an application for SIJS-specific findings under 8 *U.S.C.A.* § 1101(a)(27)(J) and 8 *C.F.R.* § 204.11, the court found as a fact that the minor's biological parents—his mother in Guatemala and his father in the United States, who was

remarried to the stepmother—had neither abused, neglected nor abandoned the minor; that factual finding required the conclusion that the minor child did not qualify for SIJS.

Specifically, the *D.C.* court found as a fact that the child's biological mother, who was living in poverty in Guatemala, did not abandon her child by "arrang[ing] to pay a smuggler $3000 to transport [P.C.] into the United States to be reunified with his father." *Id.* at 48, 8 *A.*3d 260. It also found as a fact that "the evidence fail[ed] to establish that defendant abused or neglected [the minor] while he lived with her in Guatemala." *Ibid.* Further finding as a fact that the minor "is thriving in the custody of his father" with whom he resides in the United States, *id.* at 51, 8 *A.*3d 260 the *D.C.* court underscored that neither parent had abused, neglected, or abandoned the child. In those circumstances, the conditions precedent to the SIJS findings—that "reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law[,]" as required by 8 *U.S.C.A.* § 1101(a) (27)(J)(i)—cannot be satisfied. Stated simply, because reunification with both biological parents was viable, the *D.C.* court was barred from exercising its jurisdiction.

The facts of this case are vastly different and clearly distinguishable from *D.C.* Based on the proofs adduced at the hearing, the court concludes that the boys were abandoned, abused, and neglected by their father and stepmother in Honduras. Also, the children in this case were placed with petitioner by immigration authorities, and not by another well-meaning but nonetheless viable parent. Additionally, unlike the return of the minor in *D.C.* to a fit and caring mother in Guatemala, the boys in this case, if returned to Honduras, would be at a great risk of harm. In sum, reunification with at least one parent—the father—plainly is not viable, thereby satisfying the requirements of 8 *U.S.C.A.* § 1101(a)(27)(J)(i). Whether reunification alone can be effected is not enough; in order to make the requisite SIJS findings, the court also must determine whether, under *N.J.S.A.* 9:6–1 and

*N.J.S.A.* 9:6–8.21(c), the children were abandoned, abused or neglected by one or both parents. It is to those categories that the focus must now shift.

### D.

#### *Abandonment, and Abuse or Neglect*

"Abandonment requires a finding that a parent has willfully forsaken obligations, although physically and financially able to discharge those obligations." *D.C., supra,* 417 *N.J.Super.* at 48, 8 *A.*3d 260 (*citing N.J.S.A.* 30:4C–15(d)); *In re Guardianship of J.C.,* 129 *N.J.* 1, 17, 608 *A.*2d 1312 (1992); *In re Guardianship of K.L.F.,* 129 *N.J.* 32, 39, 608 *A.*2d 1327 (1992). "The concept of abandonment entails volitional and purposeful conduct that equates with a willful giving up of parental rights and duties." *In re Guardianship of J.C., supra,* 129 *N.J.* at 17, 608 *A.*2d 1312; *In re Guardianship of K.L.F., supra,* 129 *N.J.* at 38–40, 608 *A.*2d 1327.

In New Jersey, abandonment of a child consists of any of the following acts by anyone having the custody or control of the child:

(a) willfully forsaking a child; (b) failing to care for and keep the control and custody of a child so that the child shall be exposed to physical or moral risk without proper and sufficient protection; (c) failing to care for and keep the control and custody of a child so that the child shall be liable to be supported and maintained at the expense of the public, or by child caring societies or private persons not legally chargeable with its or their care, custody and control.

[*N.J.S.A.* 9:6–1.]

Here, the boys' father was killed by drug traffickers on May 10, 2011. Also, J.E.'s and J.C.'s stepmother fled soon after her husband's murder, out of fear that she was in danger, leaving the boys behind; quite literally, abandoning them. The court finds that the boys' father willfully was involved in criminal activity and exposed his children to drug trafficking as well as all of the dangers associated with that illicit activity. These actions fall squarely within the statutory definition of abandonment. *See N.J.S.A.* 9:6–1(b) (defining "abandonment" by one in custody or control of child as including "failing to care for and keep the

control and custody of a child so that the child shall be exposed to physical or moral risk without proper and sufficient protection"). Likewise, the actions of the stepmother, fleeing soon after the murder of the boys' father and leaving the boys alone at the ages of thirteen and fourteen years old, respectively, also constitute abandonment. *See N.J.S.A.* 9:6–1(a) ("abandonment" by one in custody or control of child includes "willfully forsaking a child"); *N.J.S.A.* 9:6–1(b).

■ Having determined that the boys were "abandoned," one need not address whether they also were abused or neglected. However, at least for the sake of completeness, whether J.E. and J.C. were abused or neglected by their father and stepmother in Honduras should be addressed. Under New Jersey law, an abused or neglected child is defined as

a child less than 18 years of age whose parent or guardian . . . (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; . . . (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.

[*N.J.S.A.* 9:6–8.21(c).]

J.E.'s and J.C.'s stepmother routinely would beat them, using belts, cables, sticks, and her bare hands, leaving marks and bruises. Based on credible evidence presented at the hearing, the court concludes that the boys' stepmother, as their guardian, "inflicted upon [them] physical injury by other than accidental means which cause[d] . . . protracted impairment of physical or

emotional health[.]" *N.J.S.A.* 9:6–8.21(c)(1). This court therefore concludes that the boys' stepmother abused and neglected them.

The court also concludes that the boys' father abused and neglected the children, based largely on the father's drug trafficking; he exposed the boys to the illegal world of drug trafficking, and he specifically asked his son J.E. to deposit large, unexplained sums of money in the bank. No doubt, the boys' father created an imminent and substantial risk of harm to his children by exposing them to an arsenal of weapons, drugs, and criminal activity, each of which fits squarely within the statutory definition of abuse and neglect. *N.J.S.A.* 9:6–8.21(c)(4).

The father's abuse and neglect did not end with his death; even after their father's death, a vehicle owned by one of their father's enemies was persistently parked outside of their aunt's house, where they were hiding. The risk of harm to the boys from their father's activities is not illusory; it materialized as a result of their father's murder and his associates' or enemies' marked desire to harm the boys, as evidenced by their keeping watch outside the boys' aunt's house, where they were in hiding. The court also finds that J.E.'s and J.C.'s father abused the boys because he did nothing to protect them from the abuse by their stepmother. *N.J.S.A.* 9:6–8.21(c)(4)(b). Because the boys were abandoned, abused, and neglected by both their stepmother and father, reunification among them is not viable, and, in light of their father's violent death, it is impossible.

## E.

### *"Best Interest" Analysis*

Having determined that the boys satisfy the conditions precedent to SIJS, a final inquiry remains: whether, pursuant to 8 *U.S.C.A.* § 1101(a)(27)(J)(ii) and 8 *C.F.R.* § 204.11(c)(6), it is in J.E.'s and J.C.'s best interest to be returned to Honduras. *D.C., supra,* 417 *N.J.Super.* at 51, 8 *A.*3d 260 ("For a juvenile to qualify for special immigrant juvenile status, a court must find that . . . it

would not be in the juvenile's best interest to be returned to his or her native country or country of last habitual residence."). The touchstone of all custody determinations always has been the "best interests of the child[ren]." *Kinsella v. Kinsella*, 150 *N.J.* 276, 317, 696 *A.*2d 556 (1997) (holding that "the primary and overarching consideration is the best interest of the child").

The facts here are compelling: if the boys are returned to Honduras, they will be exposed to a great risk of harm and possibly tragic consequences. Based on substantial credible evidence in this record, the court is satisfied that there is a clear and present danger to the boys if they are returned to Honduras. On that basis, the court concludes that it is not in the best interest of J.E. or J.C. to return to Honduras.

The fact that the boys are thriving in the United States is also compelling; J.E. was recently awarded his school's student of the month award. The boys' demonstrated achievements in school further sustain the determination that it is in their best interests to remain in the United States with their mother, petitioner, who has been caring for them since they arrived in New Jersey in 2011.

### III.

#### *Conclusion*

For the reasons initially placed on the record and as outlined in this opinion, petitioner's motion to affirm custody and make "special findings" is granted. Petitioner is awarded custody of her two sons, J.E. and J.C. Based on the court's "special findings" as stated above, J.E. and J.C. may now petition the United States Customs and Immigration Services for SIJS pursuant to 8 *U.S.C.A.* § 1101(a)(27)(J) and 8 *C.F.R.* § 204.11.