NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1121-12T1

H.S.P.,

    Petitioner-Appellant,

v.

J.K.,

    Respondent-Respondent.

_____

APPROVED FOR PUBLICATION

March 27, 2014

APPELLATE DIVISION

Argued November 4, 2013 — Decided March 27, 2014

Before Judges Ashrafi, St. John and Leone.

On appeal from the Superior Court of New
Jersey, Chancery Division, Family Part,
Passaic County, Docket No. FD-16-163-13.

Francis X. Geier argued the cause for
appellant (Basaran Law Office, attorneys;
Melinda M. Basaran, on the brief).

Respondent has not filed a brief.

The opinion of the court was delivered by

LEONE, J.S.C. (temporarily assigned).

Petitioner H.S.P. filed a complaint and a motion in the

Chancery Division, Family Part, seeking custody of his

seventeen-year-old nephew, M.S., and factual findings that would

assist M.S. in obtaining Special Immigrant Juvenile ("SIJ")

status from the United States Citizenship and Immigration Services ("USCIS") of the Department of Homeland Security. A September 27, 2012 order of the Family Part awarded petitioner custody of M.S., but denied or did not make the factual findings requested. Petitioner appeals. We affirm in part and reverse and modify the court's order in part.

I.

The proceedings have been non-adversarial. The facts were presented by petitioner without participation by any opposing or neutral party. We recite the pertinent facts with an assumption of their accuracy.

Petitioner H.S.P. is a United States citizen and lives with his wife and children in Passaic County. He works as a taxi driver in New York City. M.S. is a citizen of India, born there in December 1994 to J.K. (his mother) and B.S. (his father). In July 2011, at the age of sixteen, M.S. entered the United States without documentation, that is, illegally.

In India, M.S. was raised by his mother. He has no recollection of ever meeting his father. He lived in poverty-stricken, disease-ridden slums. His older brother and sister died of unknown causes when they were about seventeen years old. Medical care was not available in their community, and his mother could not afford to travel and to pay for medical

A-1121-12T1

treatment for her children. His mother also suffered from ill health. They went to live with his maternal grandmother, who was also ill. M.S. left school and, at the age of fifteen, worked long hours in construction jobs. He developed back pain and a skin condition.

In an effort to save M.S. from unsanitary and potentially deadly living conditions, his mother and grandmother determined to send him to the United States to live with petitioner, who is the mother's brother. The mother arranged and paid for M.S. to be transported by ship to Turkey and then to Mexico. M.S. walked across the United States border in July 2011 without being admitted and without entry documentation.

He has been living in New Jersey with petitioner's family, and now considers them to be his family. Although he dropped out of school in New Jersey because he was too far behind the other students, he has obtained a General Educational Development (GED) diploma and hopes to go to college. He maintains weekly telephone contact with his mother in India.

Petitioner's complaint, filed in the Family Part in May 2012, stated that M.S. "is in need of an order granting custody of him to [petitioner] so that he may regularize his immigration status pursuant to" 8 U.S.C.A. § 1101(a)(27)(J) ("Subparagraph J") of the Immigration and Nationality Act (INA), 8 U.S.C.A. §§

1101-1537. Subsequently, petitioner filed a sworn acknowledgement of service from M.S.'s mother, in which she declined to answer the complaint and requested that default be entered against her. She said she did not oppose the petition, and she "abandoned" M.S. to petitioner.[1]

Petitioner asked the Family Part judge to make findings referenced in Subparagraph J of the federal statute and its implementing regulation, 8 C.F.R. § 204.11(d) ("the Regulation"). Specifically, petitioner asked the court to find that M.S. was dependent on the New Jersey family court, that he had been abandoned or neglected by his father and mother, and that it was not in his best interest to return to India. At a hearing on September 27, 2012, the judge heard testimony from petitioner and M.S., and reviewed the documentary evidence submitted by petitioner. Finding that the Family Part had jurisdiction to consider the petition because M.S. was a minor residing in New Jersey, the court awarded physical custody of M.S. to petitioner. However, the court found insufficient evidence that M.S. was neglected or abandoned by either of his parents, and therefore, a "best interest analysis is not required."

---

[1] Although J.K. is named as a respondent in the caption of this case, she and petitioner have acted cooperatively in bringing the petition before the Family Part.

Petitioner appeals from the Family Part's order to the extent it denied or did not make the findings he sought.

II.

SIJ status brings significant advantages for an undocumented juvenile. The INA contains special provisions for the issuance of immigrant visas to special immigrants, including juveniles. 8 U.S.C.A. §§ 1153(b)(4), 1204. SIJ status provides exemption from deportation on certain grounds, including for being "present in the United States" unlawfully. 8 U.S.C.A. § 1227(a)(1)(B), (c). A juvenile granted SIJ status is deemed "to have been paroled into the United States" for purposes of discretionary adjustment of his status "to that of an alien lawfully admitted for permanent residence." 8 U.S.C.A. § 1255(a), (h)(1). In determining the admissibility of such a juvenile as an immigrant, certain grounds of inadmissibility do not apply (including unlawful entry into the United States) and other grounds may be waived by the Attorney General. 8 U.S.C.A. § 1255(h)(2); see 8 U.S.C.A. § 1182.

In Subparagraph J, the INA defines the term "special immigrant" to include:

> an immigrant who is present in the United States —
>
> (i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally

committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;

(ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and

(iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status[.]

[8 U.S.C.A. § 1101(a)(27)(J).]

The implementing Regulation requires a petition for SIJ status to have attached a juvenile court order with findings as set forth in the statute. 8 C.F.R. § 204.11(b), (d)(2).[2] Thus, Subparagraph J creates "a special circumstance 'where a state juvenile court is charged with addressing an issue relevant only to federal immigration law.'" E.C.D. v. P.D.R.D., 114 So. 3d

---

[2] The Regulation was adopted before Subparagraph J was amended in 2008. The proposed regulations to reflect the 2008 amendment's criteria have not yet been adopted. See Special Immigrant Juvenile Petitions, 76 Fed. Reg. 54,978 (proposed Sept. 6, 2011). We will ignore those portions of the Regulation based on the former criteria of Subparagraph J that were removed by the 2008 amendment of the statute.

33, 36 (Ala. Civ. App. 2012) (quoting In re J.J.X.C., 734 S.E.2d 120, 124 (Ga. Ct. App. 2012)).

### III.

To fulfill his objectives in this case, petitioner first asked the Family Part to find that M.S. "has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court." 8 U.S.C.A. § 1101(a)(27)(J)(i).[3] Although the court exercised jurisdiction over M.S. and placed him in the custody of petitioner, we are concerned at the invocation of the Family Part's jurisdiction to obtain custody with no apparent purpose other than to seek immigration benefits.

The petition was not brought in an adversarial proceeding for custody, or initiated by any juvenile court or child welfare agency seeking to protect the health and well-being of M.S. Petitioner is M.S.'s uncle, and already had physical custody of him with the consent and approval of the boy's only available parent. M.S. was living in petitioner's home in the United

---

[3] "Juvenile court means a court located in the United States having jurisdiction under State law to make judicial determinations about the custody and care of juveniles." 8 C.F.R. § 204.11(a).

States, sent voluntarily to this country by his mother to be cared for by petitioner. No showing was made that a judicial declaration of custody was needed for any reason related to the custody statutes of this State. Most important, the only reason the Family Part's jurisdiction was invoked was petitioner's declaration that M.S. was "in need of . . . regularizing his immigration status." We question whether Congress intended Subparagraph J to apply to juveniles who are placed in the custody of an individual not because necessity was shown under State law, but because custody was requested for immigration purposes. Cf. In re C.G.H., 75 A.3d 166, 172-74 (D.C. 2013) (finding the court had jurisdiction and was required to make SIJ findings when called upon to approve a child's adoption).

In a case with facts similar to this matter, our Family Part expressed doubt that the court's jurisdiction was being invoked for proper purposes. D.C. v. A.B.C., 417 N.J. Super. 41, 47 (Ch. Div. 2010). A juvenile's step-mother sought to be appointed his guardian so the juvenile could establish the first prerequisite for SIJ status. Id. at 44. The plaintiff could offer no reason why she should have received guardianship or custody, because the juvenile was already living with his father. Id. at 47-48. The court ruled that "it is not necessary to appoint plaintiff as [the juvenile's] guardian as

8

the child is thriving in the custody of his father.  There is no need for this court to exercise jurisdiction . . . ."  Id. at 51.

Petitioner did not cite any New Jersey statute in support of his request for custody.  The trial court in D.C. cited as its jurisdictional authority N.J.S.A. 9:2-9, which allows a third party to bring an action regarding a child.  Id. at 47.[4] "N.J.S.A. 9:2-10 then allows a court, in an action brought by a third party pursuant to N.J.S.A. 9:2-9, to award custody of the child to that third party."  Watkins v. Nelson, 163 N.J. 235,

---

[4] That State statute is headed "Unfit parents and custodians, court action to grant relief," and it provides:

> When the parents of any minor child or the parent or other person having the actual care and custody of any minor child are grossly immoral or unfit to be intrusted with the care and education of such child, or shall neglect to provide the child with proper protection, maintenance and education, or are of such vicious, careless or dissolute habits as to endanger the welfare of the child or make the child a public charge, or likely to become a public charge; or when the parents of any minor child are dead or cannot be found, and there is no other person, legal guardian or agency exercising custody over such child; it shall be lawful for any person interested in the welfare of such child to institute an action in the Superior Court, Chancery Division, Family Part, in the county where such minor child is residing, for the purpose of having the child brought before the court, and for the further relief provided by this chapter.  The court may proceed in the action in a summary manner or otherwise.
>
> [N.J.S.A. 9:2-9.]

244 (2000). In a proceeding under N.J.S.A. 9:2-9 and 9:2-10, "a presumption of custody exists in favor of the parent," which a third party can overcome "by satisfying the standard required for termination of the rights of a non-consenting parent," including abandonment or neglect. Id. at 244-45. Here, the family court awarded custody of M.S. to petitioner even though it did not find that M.S.'s mother had abandoned or neglected him.

We are also concerned that petitioner asked the Family Part to find that M.S.'s father neglected and abandoned him, and to award custody of M.S. to petitioner, without naming the father in the complaint, or even attempting to serve him. A parent normally must be given the opportunity to oppose an accusation of abandonment and neglect, or an award of custody of a child to a third party, which in many respects resembles the termination of parental rights. Id. at 253-54. Service on the parent is generally required, R. 5:4-4(a); N.J.S.A. 2A:34-69, even if the parent is out of state, N.J.S.A. 2A:34-60, or out of the country, R. 4:4-4(b)(1)(B). "[W]here the adverse party cannot be located," our rules require diligent inquiry to locate a parent for service. R. 5:4-4(c).[5]

---

[5] See also N.J.S.A. 9:6-8.38(c), -8.41(b) (requiring reasonable efforts to serve a parent accused of abuse or neglect); N.J.S.A.
(continued)

We note, however, that the INA states that a juvenile "who has been battered, abused, neglected, or abandoned, shall not be compelled to contact the alleged abuser (or family member of the alleged abuser) at any stage of applying for special immigrant juvenile status."  8 U.S.C.A. § 1357(h); see 151 Cong. Rec. S 13,749 (2005) (Sen. Biden) ("This section assures that immigration authorities are not required to contact abusive parents or family members," and "prevents abusive parents from keeping their children from accessing help and support in the United States").  Thus, there may be a conflict between this section and our State laws that require efforts to provide notice to an absent parent.

We do not attempt in this appeal to resolve that apparent conflict.  Despite our concerns, we will assume that the judge's custody determination is sufficient to satisfy the first precondition for SIJ status, and we will examine the judge's other findings under Subparagraph J.

### IV.

The second finding petitioner sought was that M.S.'s "reunification with 1 or both of the immigrant's parents is not

---

(continued)
30:4C-15.1(b)(1)(b) (requiring "reasonable efforts to locate the parent" accused of abandonment); N.J.S.A. 30:4C-17(b) (requiring "adequate effort to serve notice on the parent" whose whereabouts are unknown).

viable due to abuse, neglect, abandonment, or a similar basis found under State law."  8 U.S.C.A. § 1101(a)(27)(J)(i) (emphasis added).  The Family Part found that neither the mother nor the father had abused, neglected, or abandoned the juvenile. We agree with the court's finding as to the mother, but disagree as to the father.

There was no allegation that the juvenile had been intentionally abused by his parents.  We will therefore focus on neglect and abandonment.

Petitioner argued that the mother's neglect of M.S. was shown by his lack of medical care and schooling. The judge declined to find that the mother committed an act of neglect under N.J.S.A. 9:6-1, which includes: "(a) willfully failing to provide proper and sufficient food, clothing, maintenance, regular school education as required by law, medical attendance or surgical treatment, and a clean and proper home, or (b) failure to do or permit to be done any act necessary for the child's physical or moral well-being."

Though "willfully" does not require an "evil intent or bad motive," it does require that the parent deny proper care "intentionally or purposely as distinguished from inadvertently or accidentally."  State v. Burden, 126 N.J. Super. 424, 427 (App. Div.), certif. denied, 65 N.J. 282 (1974).  Other New

Jersey statutes similarly define neglect to include a parent's failure "to exercise a minimum degree of care . . . in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so." N.J.S.A. 9:6-8.9(d); N.J.S.A. 9:6-8.21(c)(4). Failure to exercise a minimum degree of care "at least requires grossly negligent or reckless conduct." N.J. Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 306 (2011).

The evidence submitted by petitioner did not show that the mother had the financial means to provide better care to M.S. but refused to do so willfully, recklessly, or with gross negligence. Rather, petitioner's evidence showed that the mother was financially unable to provide better care for M.S. See N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 37-38 (2011) (finding failure to provide heat or medical checkups is not neglect where parents lack the financial means to do so).

In D.C., supra, 417 N.J. Super. at 49, the petitioner similarly alleged that the juvenile's ill mother in Guatemala had abused and neglected him by failing to provide adequate food, clothing, and education. The D.C. court concluded that mother's inability to provide for the child "was not the result of intentional neglect but was caused by her inability to earn

enough money to adequately support the family." Ibid. Moreover, the mother had also paid to transport the juvenile to the United States to be reunited with his father. Id. at 45. The court concluded: "These are not the actions of an abusive or neglectful parent; instead, they describe a caring mother [living in poverty] who is trying to provide better living conditions for her son." Id. at 49. We agree, and find the same conclusions applicable to this case.

Petitioner stresses that, because M.S. was the only person in the household who was physically able to work, he stopped going to school and, at the age of fifteen, worked long hours doing manual labor in construction. As a result, he developed back and skin problems, and became very thin, ill, and depressed. The judge found that M.S. had done harsh work for at least a year, causing back problems, but the judge did not find any protracted impairment to M.S. or any abuse or neglect by the mother.

New Jersey law considers it to be abuse for a parent to "permit[] a child to be employed in any vocation or employment injurious to its health or dangerous to its life or limb, or contrary to the laws of this State." N.J.S.A. 9:6-1. However, M.S. was employed in India, not New Jersey, and petitioner has not shown that M.S. was employed contrary to the laws of India.

Similarly, petitioner has not shown that M.S.'s employment exposed M.S. to danger to life or limb or injured his health in a serious or protracted way. See N.J.S.A. 9:6-8.9(b); N.J.S.A. 9:6-8.21(c)(2). We cannot conclude on this record that M.S.'s employment in India, which has not been shown to violate that country's child labor laws, shows that his mother has willfully or grossly negligently abused or neglected him within the meaning of our State child welfare laws. See D.C., supra, 417 N.J. Super. at 49-51.

Finally, petitioner asserted that the mother's neglect of M.S. was corroborated by the fatal illnesses of his two older siblings. In his testimony, M.S. was vague about the causes of the deaths of his sister and brother in 2001 and 2005, respectively. Nor was petitioner fully aware of the circumstances under which the older siblings died because he lived in the United States and had no direct knowledge. Petitioner testified generally that their deaths were due to the mother's poverty and her inability to obtain medical care and otherwise to provide for her children. In her acknowledgment of service, the mother stated that her children's illnesses and deaths were "caused by a lack of nutrition." Although proof of neglect of one child is admissible to show neglect of another child, N.J.S.A. 9:6-8.46(a)(1), the judge properly found no

15

evidence that the mother willfully failed to provide food or medical care to the siblings despite having the financial ability.

With respect to the father, although the petitioner raised abandonment and neglect, he principally contends that the father abandoned M.S. before he was born.

In considering whether there had been "abandonment" of M.S. by either his mother or his father, the judge properly utilized the definition of that term in N.J.S.A. 9:6-1:

> Abandonment of a child shall consist in any of the following acts by anyone having the custody or control of the child: (a) willfully forsaking a child; (b) failing to care for and keep the control and custody of a child so that the child shall be exposed to physical or moral risk without proper and sufficient protection; (c) failing to care for and keep the control and custody of a child so that the child shall be liable to be supported and maintained at the expense of the public, or by child caring societies or private persons not legally chargeable with its or their care, custody and control.

Other statutes similarly protect "a child who has been willfully abandoned by his parent." N.J.S.A. 9:6-8.9(e); N.J.S.A. 9:6-8.21(c)(5). Under these statutes, abandonment requires "a finding that 'a parent has willfully forsaken obligations, although physically and financially able to discharge those obligations.'" In re Adoption of a Child by D.M.H., 135 N.J. 473, 481 (1994) (quoting In re Adoption of Children by L.A.S.,

16                                                    A-1121-12T1

134 <u>N.J.</u> 127, 134-35 (1993)), <u>cert. denied</u>, 513 <u>U.S.</u> 967, 115 <u>S. Ct.</u> 433, 130 <u>L. Ed.</u> 2d 345 (1994).

The judge found that M.S. had not been abandoned by the mother, who "is actively involved in the child's life," is in "constant contact with" him, and participated in this litigation by providing the acknowledgment. The judge noted that the mother desired the award of custody to her brother in the United States because it would be better for M.S. Further, the mother paid for M.S. to be transported from India, through Turkey and Mexico, to the United States. As the judge found, these facts gave "clear indications of a mother who is unable to take care of this child and who wants nothing but the best for this child." Our Supreme Court has held that it is not willful abandonment for a parent to voluntarily surrender a child to foster care because it is in the child's best interest, or because the parent is currently incapable of providing the needed care, so long as the parent stays or tries to stay in regular contact with the child. <u>In re Guardianship of K.L.F.</u>, 129 <u>N.J.</u> 32, 38-39 (1992); <u>In re Guardianship of J.C.</u>, 129 <u>N.J.</u> 1, 6, 16-17 (1992).

In <u>D.C.</u>, the court reached the same conclusion on similar facts. An impoverished mother paid to smuggle her son from Guatemala to the United States to live with his father, because

she was not "physically and financially able" to care for him, and she remained in contact with the juvenile after he arrived here. D.C., supra, 417 N.J. Super. at 45, 48. The court aptly found that "[n]o rational view of this evidence can support the conclusion that defendant abandoned her son." Id. at 48. The United States District Court has also declined to find parental abandonment in factual circumstances similar to this case. The federal court concluded that an African father who sent his son to the United States and "wanted the best for his son and remained in regular communication with him," was "a concerned father" rather than "an abusive, neglectful father who abandons his son." Yeboah v. U.S. Dep't of Justice, 223 F. Supp. 2d 650, 658 (E.D. Pa. 2002), aff'd, 345 F.3d 216 (3d Cir. 2003).

Here, the evidence supports the judge's finding that the juvenile's mother did not abuse, neglect, or abandon him. Therefore, under the terms of Subparagraph J, petitioner did not show that reunification of M.S. with his mother was "not viable due to abuse, neglect, or abandonment." 8 U.S.C.A. § 1101(a)(27)(J)(i).

We do not reach the same conclusion with respect to the juvenile's father. The mother certified that the father was addicted to alcohol and drugs and abandoned the family before M.S. was born. M.S. testified that he never met his father. He

was unaware that his father had ever sent any money for him or his mother. Petitioner claimed that no one knew the father's whereabouts or even his date of birth to assist in locating him.

The family court cited the allegation that the father's abandonment was a result of alcoholism or drug addiction, and concluded there was insufficient evidence that the father's conduct was willful. Some cases have found that addicted parents have not abandoned their child. In re Guardianship of K.H.O., 308 N.J. Super. 432, 455 (App. Div. 1998), rev'd on other grounds, 161 N.J. 337 (1999); In re Adoption of a Child by J.R.D., 246 N.J. Super. 619, 629 (Ch. Div. 1990). In those cases, however, the parent made efforts to maintain contact with the child, and expressed a desire for reunification. K.H.O., supra, 308 N.J. Super. at 437 (noting the parent's many visits); J.R.D., supra, 246 N.J. Super. at 623-25, 628-29 (noting the parent's visits with his child, efforts to find her after the child moved, intermittent payment of child support, and opposition to the adoption petition). We are not aware of any case that holds that a total disregard of parental duties, although caused by alcohol or drug addiction, is insufficient to constitute abandonment of a child.

As we have stated, abandonment must be willful. The "parent 'must have engaged in a course of conduct that

A-1121-12T1

"evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child."'" D.M.H., supra, 135 N.J. at 481 (citations omitted). Here, the evidence was that the father engaged in such a course of conduct and abandoned his parental duties to his children. The father's absence during the juvenile's entire life plainly demonstrates his settled purpose to forego his parental duties and relinquish parental claims to M.S. See N.J.S.A. 30:4C-15.1(b)(1)(a)-(b) (permitting the termination of parental rights for abandonment if the parent has had no contact with the child for six months or more and the parent's whereabouts are unknown).

The family court also noted that petitioner and the juvenile's mother had not tried to find the father for purposes of adjudicating this petition. As noted above, it is unclear what if any contact, notice, or service is required or permitted in the context of an SIJ determination. In any event, as the Family Part proceeded to grant custody and make findings without such an effort, we do not regard this as a basis on which to refuse to find abandonment.

We must hew to our standard of review, which requires deference to a trial court's factual findings. N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010) (citations omitted). We nevertheless conclude that the court

erred in finding insufficient evidence that father had in fact abandoned the juvenile. See N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 114-15 (App. Div. 2004). Petitioner was thus entitled to a finding that M.S.'s reunification with his father is not viable because of abandonment. See 8 U.S.C.A. § 1101(a)(27)(J)(i).

V.

Petitioner also asked the Family Part to make an additional finding that "it would not be in the [juvenile's] best interest to be returned to the [juvenile's] or parent's previous country of nationality or country of last habitual residence." 8 U.S.C.A. § 1101(a)(27)(J)(ii). Petitioner presented evidence of the deplorable conditions in the slums of India, the greater opportunities available in the United States for nutrition, education, and medical care, and the love and support of M.S. by petitioner and his family.

The judge declined to make a "best-interest" determination because he found insufficient evidence that either parent had abandoned or neglected the juvenile. Because we disagree with the judge's finding regarding the father, we must address the federal statute further and determine whether it applies to circumstances where only one parent has abused, neglected, or

abandoned the juvenile but the other parent has not, and reunification with the other parent is viable.

Several commentators[6] and several courts, <u>In re Minor Children of J.E.</u>, 432 <u>N.J. Super.</u> 361, 372 (Ch. Div. 2013); <u>In re Marisol N.H.</u>, 979 <u>N.Y.S.</u>2d 643, 647 (App. Div. 2014); <u>In re Marcelina M.-G. v. Israel S.</u>, 973 <u>N.Y.S.</u>2d 714, 721-23 (App. Div. 2013); <u>In re Mario S.</u>, 954 <u>N.Y.S.</u>2d 843, 851 (Fam. Ct. 2012),[7] have interpreted Subparagraph J as requiring proof that only one parent abused, neglected, or abandoned a juvenile, even where the available custodial parent did not and reunification with that parent is viable. On the other hand, the Supreme Court of Nebraska fully analyzed the federal statute and held that the requirements of Subparagraph J are not met where one parent is available and did not abuse, neglect, or abandon the

---

[6] <u>See</u> Jennifer Baum, Alison Kamhi, and C. Mario Russell, <u>Most In Need But Least Served: Legal And Practical Barriers To Special Immigrant Juvenile Status For Federally Detained Minors</u>, 50 <u>Fam. Ct. Rev.</u> 621, 622 (2012); Laureen A. D'Ambra, <u>The Vital Role of the Rhode Island Family Court and its Unique Jurisdiction in Immigration Cases Involving Abused and Neglected Children</u>, 15 <u>Roger Williams U. L. Rev.</u> 24, 31 (2010); Angie Junck, <u>Special Immigrant Juvenile Status: Relief for Neglected, Abused, and Abandoned Undocumented Children</u>, 63 <u>Juv. & Fam. Ct.</u> 48, 56 (2012); <u>see also</u> 3 Charles Gordon et al., <u>Immigration Law & Procedure</u> § 35.09 at 35-44 & n.79 (rev. ed. 2013)(quoting cases).

[7] In accordance with <u>Rule</u> 1:36-3, we do not cite unpublished opinions, such as that of an intermediate appellate court in Minnesota that reached the same conclusion as the cited cases.

juvenile. <u>State v. Erick M.</u>, 820 <u>N.W.</u>2d 639, 644-47 (Neb. 2012). The Nebraska court stated: "when ruling on a petitioner's motion for an eligibility order under § 1101(a)(27)(J), a court should generally consider whether reunification with either parent is feasible." <u>Id.</u> at 648. The Nebraska court ruled that because "reunification with [the juvenile's] mother was feasible, he was not eligible for SIJ status," and he "was not seeking SIJ status to escape parental abuse, neglect, or abandonment." <u>Id.</u> at 642, 648. We agree with the holding of the Nebraska court, and overrule the contrary holding of <u>J.E.</u>, <u>supra</u>, 432 <u>N.J. Super.</u> at 372.

Subparagraph J requires a finding by the family court that a juvenile's "reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law." 8 <u>U.S.C.A.</u> § 1101(a)(27)(J)(i). We understand the "1 or both" phrase to require that reunification with neither parent is viable because of abuse, neglect, or abandonment of the juvenile. In other words, the statute is not satisfied where reunification with one or both parents is viable. We hold that it is insufficient that reunification with one parent is not viable due to abuse, neglect, or abandonment, if the juvenile has another "safe" parent who has not abused, neglected or abandoned the juvenile.

23

If that parent is deceased or unable to protect the child against abuse or neglect by the unsafe parent, then reunification with one or both of the juvenile's parents is not viable due to abuse, neglect, or abandonment.

The legislative history of Subparagraph J supports our understanding of the statute. "The SIJ provisions of the INA were enacted in 1990 to protect abused, neglected, or abandoned children who, with their families, illegally entered the United States." Yeboah v. U.S. Dept. of Justice, 345 F.3d 216, 221 (3d Cir. 2003). "Rather than being deported along with abusive or neglectful parents, or deported to parents who had abandoned them once in the United States, such children may seek special status to remain in the United States." Ibid. As originally enacted, however, the statute "was abused . . . by juveniles entering the United States as visiting students" who used it to improve their immigration status. Ibid.

In 1997 Congress amended Subparagraph J to require the juvenile to have "been deemed eligible . . . for long-term foster care due to abuse, neglect, or abandonment." Depts. of Commerce, Justice, & State, the Judiciary, & Related Agencies Appropriation Act, Pub. L. No. 105-119, § 113, 111 Stat. 2440, 2460 (1997). Congress also added that the Attorney General (now the Secretary of Homeland Security) must expressly consent to

24

the grant of SIJ status. Ibid. The conference report stated that "[t]he language has been modified in order to limit the beneficiaries of this provision to those juveniles for whom it was created, namely abandoned, neglected, or abused children," and to ensure that the juvenile court determination was not "sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect." H.R. Rep. No. 105-405, at 130 (1997). Congress thus sought to deter juveniles and their parents from "attempting to manipulate the system to obtain permanent residence" for juveniles in the United States. Yeboah, supra, 345 F.3d at 224; see also M.B. v. Quarantillo, 301 F.3d 109, 114 (3d Cir. 2002) ("The legislative history confirms that the revision in the statute was intended to curtail the granting of special immigrant juvenile status.").

In 2008, Congress amended the statute further by enacting the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 235(d)(1)-(3), 122 Stat. 5044, 5079-80 (2008). Section 235 of the Wilberforce Act made two pertinent changes to Subparagraph J. First, by permitting SIJ applications from juveniles who were placed under the custody of "an individual or entity appointed by a State or juvenile court," ibid., the amendment "broadened

the category of those to whom a child's custody could be legally committed." C.G.H., supra, 75 A.3d at 168 n.2.

Second, the 2008 amendment removed the phrase "eligible for long-term foster care," and substituted "reunification with 1 or both of the immigrant's parents is not viable." This represented less of a change than it appeared, as the Regulation already provided that "[e]ligible for long-term foster care means that a determination has been made by the juvenile court that family reunification is no longer a viable option." 8 C.F.R. § 204.11(a).[8] The 2008 amendment retained the 1997 requirement that reunification not be viable because of "abuse, neglect, [or] abandonment," adding "or a similar basis found under State law." Ibid.

There is no specific legislative history on the "1 or both" language. 3 Charles Gordon et al., Immigration Law & Procedure § 35.09 at 35-44 (rev. ed. 2013) ("The shift in language . . . was accomplished without a trace of legislative history.").[9]

---

[8] See Randi Mandelbaum and Elissa Steglich, Disparate Outcomes: The Quest for Uniform Treatment of Immigrant Children, 50 Fam. Ct. Rev. 606, 608 (2012).

[9] The proposed regulations similarly are "silent on the issue of the one-parent versus two-parent question." Id. at 35-44 n.80; see Erick M., supra, 820 N.W.2d at 644.

However, some guidance can be gained from the legislative history of the 2008 legislation as a whole.

The 2008 Wilberforce Act was intended to continue the fight against human trafficking. H.R. Rep. No. 110-430, pt. 1 at 3.[10] The legislation was named to recognize "the immense contributions of British Parliamentarian William Wilberforce to the abolition of the global slave trade in the 19th Century." Id. at 34. One of its key initiatives was "[p]reventing the trafficking of unaccompanied alien children found in the United States by ensuring that they are not repatriated into the hands of traffickers or abusive families." Id. at 33; see 153 Cong. Rec. H. 14,098, 14,121 (Rep. Sanchez); 154 Cong. Rec. S. 4,795, 4,800 (2008) (Sen. Biden); 154 Cong. Rec. H. 10,888, 10,903 (2008) (Rep. Berman). The legislation's section that amended Subparagraph J was entitled "Enhancing Efforts to Combat the Trafficking of Children." § 235, 122 Stat. at 5074-80.

At the same time, Congress did not forget the concerns it had expressed in 1997. At the introduction of the bill, Representative Lamar Smith stated that the bill would add "reasonable protections for unaccompanied alien minors," and thanked the sponsors for addressing his concerns by modifying

_____

[10] This House Report accompanied the bill that first introduced the "1 or both" language.

provisions to discourage "illegal immigration and immigration fraud." 153 Cong. Rec. H. 14,098, 14,121 (2007). When the bill was ultimately passed, Senator Dianne Feinstein stated: "This legislation does not expand the current immigration rights of any child. Instead, it presumes that children will be placed in removal proceedings — unless they qualify for immigration benefits under current law." 154 Cong. Rec. S. 10,886, 10,887 (2008).

Congress's continued concern with misuse of the law was reflected in the Executive Branch's implementation of Subparagraph J. Guidance memoranda to federal immigration directors, issued both before and after the 2008 amendment, instruct that the Secretary of Homeland Security "will not consent to a petition for SIJ status if it was sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect or abandonment." See Erick M., supra, 820 N.W.2d at 646 & n.25 (citations and quotation marks omitted). The proposed regulations would explicitly incorporate this language into 8 C.F.R. § 201.11. Special Immigrant Juvenile Status, 76 Fed. Reg. 54,978, 54,981-82, 54,985 (proposed Sept. 6, 2008).

Thus, the legislative and administrative history of Subparagraph J shows two competing goals. Congress wanted to

permit use of the SIJ procedure when necessary to prevent the return of juveniles to unsafe parents. Where such protection is unnecessary, however, Congress wanted to prevent misuse of the SIJ statute for immigration advantage.

Our understanding of Subparagraph J — that it requires a finding that reunification with neither parent is viable because of abuse, neglect, or abandonment — achieves both of Congress's goals. It effectuates Congress's protective goal by making a juvenile eligible for SIJ status if the juvenile cannot be reunited with a parent without being put in danger by an unsafe parent. It also serves Congress's goal of preventing misuse of the statute by not granting immigration advantages when the juvenile has a safe parent with whom he can be reunited.

The contrary interpretation does not achieve both of Congress's goals. It would mean that a juvenile could apply for SIJ status, with its immigration advantages, even if that juvenile could be viably reunified with one parent who never abused, neglected, or abandoned the juvenile. Indeed, it would permit SIJ status even if that safe parent had raised the juvenile from birth, in love, comfort, and security, and even if reunification with the safe parent would not result in any further contact with the unsafe parent. Nothing in the legislative history of Subparagraph J supports such a broad

29

interpretation. Finally, that broad interpretation would render Subparagraph J's words "or both" superfluous, because it would always be sufficient that "reunification with 1 . . . of the immigrant's parents is not viable."

Petitioner and M.S. presented a sympathetic case to the family court. However, courts misuse their power and authority if they misinterpret and misapply a statute contrary to its legislative intent. If Congress wished to create a "'gateway'"[11] for all abused or impoverished foreign juveniles to enter the United States and benefit from the better conditions provided in this country, it could have done so. It did not do so by enacting the 2008 amendments to Subparagraph J. See Garcia v. Holder, 659 F.3d 1261, 1271 (9th Cir. 2011) (Subparagraph J shows "a congressional intent to assist a limited group of abused children to remain safely in the country"). The purpose of Subparagraph J remains the protection of those abused, neglected, or abandoned juveniles whose compelled repatriation would place them in danger from a parent who abused, neglected, or abandoned them.

In Yeboah, the United States Court of Appeals for the Third Circuit stated:

---

[11] See Mario S., supra, 954 N.Y.S.2d at 848 (citations omitted).

> SIJ status is supported if "neither the dependency order nor the administrative or judicial determination of the alien's best interest was sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect."
>
> [Yeboah, supra, 345 F.3d at 222 (quoting H.R. Rep. No. 105-405, at 130 (1997)).]

The 2008 amendments did not alter that intent of the federal law. Erick M., supra, 820 N.W.2d. at 645 & n.23. Here, the express objective of the petition was for M.S. to obtain relief for purposes of his immigration status, rather than for the purpose of obtaining relief from abuse, neglect, or abandonment, as his mother had not abused, neglected, or abandoned him.

We therefore hold that the Family Part was not required to make a "best interest" finding under 8 U.S.C.A. § 1101(a)(27)(J)(ii) because petitioner failed to satisfy 8 U.S.C.A. § 1101(a)(27)(J)(i). As set forth above, there was sufficient credible evidence supporting the court's finding that the mother had not abused, neglected, or abandoned M.S., and petitioner failed to show reunification with the mother was not viable for those reasons.

Finally, we note that when M.S. was before the trial court, he was seventeen years old, and that he is now nineteen. The

Family Part in this State would typically not decide the issue of a juvenile's custodial status and best interests if he has reached the age of majority, generally eighteen years old. See N.J. Div. of Youth & Family Servs. v. W.F., ___ N.J. Super. ___ (App. Div. Jan. 28, 2014) (slip op. at 9-13). However, under federal law, an alien remains eligible for SIJ status if he "[i]s under twenty-one years of age," "[i]s unmarried," and "[h]as been" found to meet the criteria of Subparagraph J. 8 C.F.R. § 204.11(c); see also 8 U.S.C.A. § 1232(d)(6) ("Notwithstanding any other provision of law, an alien described in [Subparagraph J] may not be denied special immigrant status under such section after the date of the enactment of this Act based on age if the alien was a child on the date on which the alien applied for such status."). Because the application was filed and heard before M.S. reached the age of majority, his current age does not moot the appeal.

Affirmed in part, reversed in part, and remanded for modification of the Family Part's order to include a finding for purposes of Subparagraph J that M.S. was abandoned by his father.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1121-12T1