# Third District Court of Appeal

## State of Florida

Opinion filed December 30, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-962
Lower Tribunal No. 15-15232
_____

**In The Interest of:
B.R.C.M., a minor child,**
Appellant,

An Appeal from the Circuit Court for Miami-Dade County, Cindy S. Lederman, Judge.

Immigrant Children's Justice Clinic, FIU College of Law, and Ricardo Rodriguez and Mary M. Gundrum; Baker & McKenzie LLP and Steven Hadjilogiou and Angela C. Vigil, for appellant.

Karla Perkins, Appellate Counsel for Department of Children & Families.

Before SHEPHERD, SALTER and LOGUE, JJ.

SHEPHERD, J.

This is another in a series of cases in which an unaccompanied minor, who illegally crossed the border of the United States, seeks an order finding him or her

dependent under Chapter 39 of the Florida Statutes, for the sole purpose of helping the child obtain legal residency in the United States. We previously have affirmed trial court denials of dependency in six similar cases. See In the Interest of F.J.G.M., 40 Fla. L. Weekly D1908 (Fla. 3d DCA Aug. 12, 2015); D.A.O.L. v. Dep't of Children & Families, 170 So. 3d 927 (Fla. 3d DCA 2015); In re J.A.T.E., 170 So. 3d 931 (Fla. 3d DCA 2015); M.J.M.L. v. Dep't of Children & Family Servs., 170 So. 3d 931, 932 (Fla. 3d DCA 2015); In re B.Y.G.M., 176 So. 3d 290 (Fla. 3d DCA 2015); In re K.B.L.V., 176 So. 3d 297 (Fla. 3d DCA 2015). We now add one more to the list.

## Procedural and Factual Background

Like the petitioners in the prior cases, B.R.C.M. was born in Central America, in this case, Guatemala. B.R.C.M. was abandoned by his father at birth and his mother when he was four-years old. His grandmother then took him into her house and cared for him until he turned age fourteen, when he and some friends left Guatemala, travelled through Mexico, and entered the United States illegally at Hidalgo, Texas. B.R.C.M.'s stated reasons for taking this action, according to the sworn petition filed in this case, are that his grandmother had arrived at an age where she no longer was able to care for him, he did not have any other family members in Guatemala, and he feared he would be assaulted and forced to join a local gang. Upon crossing the border, B.R.C.M. turned himself in

2

to the border patrol, and, before the month was out, the Office of Refugee Resettlement of the United States Department of Health & Human Services placed him with his godmother in Miami. Within days of his arrival in Miami, B.R.C.M. heard from and received a visit from his father, allegedly for the first time since birth. Although B.R.C.M.'s father has not provided any food or money for basic necessities,[1] he has maintained telephone contact with B.R.C.M. since that time.

B.R.C.M.'s sole purpose for filing the Petition for Dependency in this case is to facilitate an application for Special Juvenile Immigrant Status and seek lawful permanent residency status in the United States. See 8 U.S.C. § 1101(a)(27)(J). As with every case of this type that has come before this court, B.R.C.M. does not seek any services from the Florida Department of Children and Families. His godmother is providing his every need.

## Analysis

The case before us is distinguishable from all the others that have come before this court in only one respect—the caretaker in this case is neither a parent nor a legal guardian, but instead a godmother. We nevertheless affirm the dismissal of this case by the trial court. As counsel for the Department, whom the court ordered to attend the oral argument in this matter,[2] conceded, the purpose of

---

[1] Nor has B.R.C.M.'s pro bono counsel sought an order requiring B.R.C.M.'s father to contribute to his support.

[2] Counsel for the Department admitted at oral argument in this case that section 39.051(51) of the Florida Statutes makes it a party to every private dependency

3

the dependency provisions of Chapter 39 of the Florida Statutes, §§ 39.501-39.510,

Fla. Stat. (2015), is not to facilitate the pursuit of Special Juvenile Immigrant

Status, but rather to provide services to children who are **truly** abandoned, abused

or neglected:

> Court: The purpose of this statute is not what it is being used for in this case, the purpose of this statute, according to section 39.001 is "to provide for the care, safety, and protection of children," correct?
>
> DCF Counsel: Correct.
>
> Court: So this is not the purpose of the statute, correct?
>
> DCF Counsel: Correct, unless they are **truly** abandoned, abused or neglected.

(Emphasis added.) It is plain on the face of the petition that B.R.C.M. is not

"truly" abandoned, abused or neglected within the meaning of Chapter 39 of the

Florida Statutes.

As to abandonment, section 39.01 of the Florida Statutes states:

---

petition filed in the circuit court. Counsel also announced that as a result of the issuance of our opinion in B.Y.G.M. on July 15, 2015, the Department had abandoned its policy of not participating in these cases. Recent filings in this court indicate that the Department has resumed its practice of opposing these petitions. See Appellee's Answer Brief at 5-6, W.A.Z.R. v. Dep't of Children & Families, No. 15-1577 (Fla. 3DCA Dec. 2, 2015) (explaining that Chapter 39 "focuses on the lack of care a child **is** experiencing because the person responsible for the child – a parent or caregiver – has failed in their parental duties toward the child" as distinguished from some remote harm) (emphasis added); Appellee's Answer Brief at 4, S.F.A.C. v. Dep't of Children & Families, No. 15-2120 (Fla. 3DCA Nov. 16, 2015) (denying petition for dependency where petitioner's proffered evidence is insufficient to support an adjudication of dependency).

4

(1) "Abandoned" or "abandonment" means a situation in which the parent or legal custodian of a child or, in the absence of a parent or legal custodian, the caregiver, while being able, has made no significant contribution to the child's care and maintenance or has failed to establish or maintain a substantial and positive relationship with the child, or both. For purposes of this subsection, "establish or maintain a substantial and positive relationship" includes, but is not limited to, frequent and regular contact with the child through frequent and regular visitation or frequent and regular communication to or with the child, and the exercise of parental rights and responsibilities. Marginal efforts and incidental or token visits or communications are not sufficient to establish or maintain a substantial and positive relationship with a child.

"Caregiver" is defined to mean "the parent, legal custodian, permanent guardian, adult household member, or **other person responsible for a child's welfare** as defined in subsection (47)." <u>See</u> § 39.01(10), Fla. Stat. (Emphasis added.). Subsection 47 provides in pertinent part:

(47) "Other person responsible for a child's welfare" **includes** the child's legal guardian or foster parent; an employee of any school, public or private child day care center, residential home, institution, facility, or agency; a law enforcement officer employed in any facility, service, or program for children that is operated or contracted by the Department of Juvenile Justice; or any other person legally responsible for the child's welfare in a residential setting; and also includes an adult sitter or relative entrusted with a child's care.

(Emphasis added.) Although a "godmother" is not expressly included in the enumeration of other persons responsible for a child's welfare in subsection 47, the definition by its terms is not exclusive. <u>See</u> *Include*, <u>Black's Law Dictionary</u> (10th ed. 2014) ("**include** *vb.* (15c) To contain as a part of something. • The

5

participle *including* typically indicates a partial list…."); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 132 (2012) ([T]he word *include* does not ordinarily introduce an exhaustive list….). Especially considering the purpose of the statute is to assist families and children who are truly needy, we decline to accept the crabbed interpretation of "other persons" sought by the petitioner in this case.

On this measure, the case before us is indistinguishable from In re B.Y.G.M., 176 So. 3d at 290. B.Y.G.M. was a native of El Salvador. His father abandoned him when he was eight-months old, and his mother left for the United States when B.Y.G.M. was three-years old. After he illegally entered the United States, the Office of Refugee Resettlement placed him with his mother in the United States. Just as with B.R.C.M., B.Y.G.M.'s every need was met at the time he filed his petition for dependency. In B.Y.G.M., we concluded that the "father's abandonment was . . . too remote to serve as the basis for dependency and did not cause B.Y.G.M. any harm." Id. at 293 (citing B.C. v. Dep't of Children & Families, 846 So. 2d 1273, 1274 (Fla. 4th DCA 2003) ( stating that "[i]n order to support an adjudication of dependency, the parents' harmful behavior must be a present threat to the child")). The same conclusion obtains, a fortiori, in this case.

B.R.C.M.'s claim of abuse under Chapter 39 fails for the same reason. Section 39.01(2) of the Florida Statutes defines "Abuse" as follows:

(2) "Abuse" means any willful act or threatened act that results in any physical, mental, or sexual abuse, injury, or harm that causes or is likely to cause the child's physical, mental, or emotional health to be significantly impaired. Abuse of a child includes acts or omissions. Corporal discipline of a child by a parent or legal custodian for disciplinary purposes does not in itself constitute abuse when it does not result in harm to the child.

There is no allegation in this case that anyone has ever laid a hand or threatened to lay a hand on B.R.C.M., even while he resided in his home country, Guatemala. His problem is one typical of all minors who are not safe outside their homes because of a government that is unable to provide them, their family members and neighbors a safe environment in which to go about their daily lives. Sadly, what exists in Guatemala is what exists in the majority of countries of the world today—lawless nations and societies which do not provide or do not choose to provide freedom, safety and security to their citizens. Whether or not to accommodate individuals of any age into this country on the basis of the conditions of the country in which they were born or reside is not for us to decide. It is a matter of federal policy entrusted to the United States Congress. See, e.g., Galvan v. Press, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress.").

Finally, there is no cognizable claim in this case for an adjudication of dependency based upon "neglect." Section 39.01(44) of Florida's dependency law defines "neglect" as follows:

7

(44) "Neglect" occurs when a child is deprived of, or is allowed to be deprived of, necessary food, clothing, shelter, or medical treatment or a child is permitted to live in an environment when such deprivation or environment causes the child's physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired. The foregoing circumstances shall not be considered neglect if caused primarily by financial inability unless actual services for relief have been offered to and rejected by such person.

B.R.C.M. does not seriously contend that his grandmother neglected him during the ten years he lived in her home in Guatemala. Rather, the gravamen of his petition is that it was his parents who "neglected" him by leaving him behind or not making any arrangements for someone to take care of him. For example, paragraph 23 of the petition alleges:

[B.R.C.M.] is a neglected child because his parents failed to provide for him or arrange for the provision of his basic necessities. [B.R.C.M.]'s parents "permitted [B.R.C.M.] to live in an environment" in which his health was "in danger of being significantly impaired." [B.R.C.M.]'s parents made no arrangements for someone to take care of [B.R.C.M.], nor did they send [B.R.C.M.] any money to provide himself with food and clothing."

In making this allegation, the petitioner conflates "neglect" with "abandonment." The harm alleged here is a consequence of B.R.C.M.'s abandonment. There is no claim that his mother, the only parent he had during the first four years of his life, "neglected" him during those early years, or that B.R.C.M.'s grandmother did not do all she could possibly do in her circumstance during the ten years B.R.C.M. lived with her. Rather, B.R.C.M. avers only that after ten years living with his

8

grandmother, the grandmother—now having reached the age of seventy-five—could no longer take adequate care of him. Although this claim, like every other one made by the petitioner, is too remote to constitute "neglect" under section 39.01(44) of the Florida Statutes, it also fails on the merits of the allegations of the petition.

The petitioner in this and all similar cases have urged that a literal interpretation of Chapter 39 affords them the blessing of a dependency adjudication. For example, one of the specific allegations in this case is that, without more, B.R.C.M. is entitled to a dependency adjudication because one of the definitions of a "dependent child" in section 39.01 of the Florida Statutes is "[a child] whom the court finds . . . (e) [t]o have no parent or legal custodians capable of providing supervision or care."[3] A godmother is neither a parent nor legal custodian under the statute.[4] However, it is apodictic among the canons of judicial interpretation that judicial interpreters should consider the entire text of a statute, including its structure and the physical and logical relation of its many parts, when

---

[3] The other claims in this case are that B.R.C.M. is dependent on the court pursuant to section 39.01(15)(a) and (f).

[4] B.R.C.M.'s godmother is an "Office of Refugee Resettlement approved sponsor," entrusted with his custody under federal law. One of the obligations of such a sponsor is to "make best efforts to establish legal guardianship with your local court within a reasonable time." See Office of Refugee Resettlement Agreement, available at http://www.acf.hhs.gov/programs/orr/resource/unaccompanied-children-services. It has been fifteen months since the Office of Refugee Settlement placed B.R.C.M. with his godmother. The godmother has yet to fulfill that obligation.

applying the language of the statute to a set of facts. See, e.g., Scalia & Garner, supra at 167 ("Perhaps no interpretative fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts."). Counsel for B.R.C.M. ignores this canon of construction, instead engaging in a process of etymological dissection in which he seeks to separate words and phrases and then apply to each to reach his desired result. This interpretive form is contrary to acceptable revelatory practice in the field of statutory construction. See 2A Sutherland Statutory Construction § 46:5 (7th ed.) ("The meaning of a statute is determined, not from special words in a single sentence or section, but from the statute as a whole and viewing legislation in light of its general purpose."); see also Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 545 U.S. 409, 415 (2005) ("Statutory language has meaning only in context."); QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc., 94 So. 3d 541, 551 (Fla. 2012) ("In determining the meaning of the language used, the court must look not only to the words themselves but also to 'the context in which the language lies.'") (quoting Miele v. Prudential-Bache Sec., Inc., 656 So. 2d 470, 472 (Fla. 1995)). We conclude, just as we did recently in In re K.B.L.V.: "The purpose of the dependency laws of this state is to protect and serve children and

10

families in need, not those with a different agenda." 176 So. 3d 297, 301 (Fla. 3d DCA 2015) (J. Shepherd, specially concurring).

For this reason, we affirm the order under review.

Affirmed.

LOGUE, J., concur.

In re B.R.C.M.<br>Case No. 3D15-962

SALTER, J. (dissenting).

11

I respectfully dissent. B.R.C.M.'s "private petition" for dependency, filed on behalf of an undocumented, fifteen-year-old immigrant, warrants individualized consideration and adjudication rather than summary denial. B.R.C.M.'s petition seeks an adjudication that would assist him in applying for "special immigrant juvenile" (SIJ) status under federal immigration law,[5] but that is not a basis for summarily dismissing or denying the petition.

B.R.C.M.'s petition states a legally sufficient claim. The petition was served by email on the Department of Children and Families (DCF), which did not oppose or support the petition below.[6] The transcript of the only hearing in the trial court regarding the petition indicates that the colloquy between court and counsel lasted eight minutes. No evidence was presented, and no fact-finding resulted. Following the colloquy, the trial court denied the petition, as a matter of law and based on a prior circuit court case, In re E.G.S.-H., 22 Fla. L. Weekly Supp. 693b (Fla. 11th Cir. Ct. Jan. 27, 2015). The trial court also advised that it was "waiting to see what the appellate court does."

---

[5] See 8 U.S.C. § 1101(a)(27)(J); see also § 39.5075, Fla. Stat. (2015).

[6] At oral argument, and as quoted in the majority opinion, counsel for DCF reported that DCF will follow the dependency statutes when a petitioning juvenile immigrant is "truly" abandoned, abused, or neglected. In my view, DCF cannot assess whether a petitioning juvenile immigrant has been "truly" abandoned, abused, or neglected without investigation, and should not decline to support or oppose the claims in a sworn SIJ petition, as occurred in B.R.C.M.'s case.

We should reverse the summary denial and remand the case for investigation by DCF and for an evidentiary hearing and adjudication. Alternatively, we should certify the central issue in this case to the Supreme Court of Florida on the grounds that it is of great public importance, and we should certify conflict between the majority opinion and decisions of other district courts of appeal.[7]

The minors seeking an adjudication of dependency (represented by a "next friend" and attorney appearing *pro bono publico*) in this and other SIJ cases are children seeking protection from harm, are inside our state borders, and are entitled to have their petitions individually adjudicated.

In response to my colleagues' differing view of this case and this "series of cases,"[8] this opinion will: review the history of cases considering SIJ petitions by immigrant juveniles in Florida, including the Miami-Dade circuit court's recent shift toward summary denials and this Court's per curiam affirmance of such denials; respond to the argument that only the federal immigration authorities, not state courts, should deal with these issues; and address the importance of

[7] See, e.g., In re Y.V., 160 So. 3d 576, 580 (Fla. 1st DCA 2015) (concluding that a petition on behalf of immigrant minor should not be rejected when motivated by a desire to obtain special immigrant juvenile status; "In fact, this desire is supported by the federal and state statutory system when it serves the greater purpose of protecting the child from harm.") (reversing and remanding case for further proceedings).

[8] Majority op. at 1.

adjudicative findings—even if those findings only involve one of the petitioner's parents—to each individual petitioner.

A recent opinion by the Supreme Court of New Jersey[9] has carefully analyzed the role of state courts regarding SIJ issues. That opinion describes a practical procedure applicable to such cases and provides a rational template that Florida courts should adopt. We should also certify the recurring legal issue posed by such cases to the Supreme Court of Florida based on inter-district conflict and as an issue of great public importance.[10] The number of such cases, the need for statewide uniformity, and the federal-state tension suggested by my colleagues in this and other opinions warrant certification on both of those grounds.

I.    Procedural and Factual Background

B.R.C.M. was fifteen years old when he filed his sworn petition. He was assisted by a law school clinical professor and certified legal interns on behalf of the Florida International University College of Law. His petition alleged that he was born in Guatemala; that his father abandoned him at birth and never provided B.R.C.M. food, clothing, shelter, or medical care;[11] that his mother disappeared

---

[9] H.S.P. v. J.K., 121 A.3d 849 (N.J. 2015).

[10] Fla. R. App. P. 9.030(a)(2)(A)(iv) and (v), respectively. This case could also be identified as a "pipeline" case for consideration by the Supreme Court of Florida in another SIJ case, O.I.C.L. v. Department of Children & Families, Case No. SC15-1570 (Fla. Oct. 30, 2015) (oral argument set for Feb. 2, 2016).

[11] B.R.C.M. alleged that he met his father for the first time after B.R.C.M. arrived

when he was four and never contacted him or provided food, clothing, shelter, or medical care for him; that his grandmother, then 75 years of age and infirm, brought him into her home in Guatemala, but could not provide a long-term home because of her own illness and age; that he had no other family members in Guatemala who could protect him from a local gang; and that he fled Guatemala at thirteen years of age. He alleged that he had been released by federal immigration authorities to his godmother as a "sponsor," and that he was residing in Miami with her.

B.R.C.M. alleged that he is a "dependent child" under three separate criteria in the statutory definition of that term in section 39.01(15), Florida Statutes (2015): he has been abandoned and neglected by each of his parents under (15)(a); he has no parent or legal custodian capable of providing supervision and care under (15)(e); and he is at substantial risk of imminent abuse, abandonment, or neglect by his parent, parents, or legal custodian under (15)(f). He sought an adjudication of dependency under each of these criteria, as well as an order determining that it is in his "best interests" not to be returned to his home country.

Upon receipt of a copy of the petition by email after it was filed in the trial court, DCF did not investigate the allegations. At the single hearing in the case, at which no testimony or other evidence was received, the trial court denied the in Miami. They have spoken occasionally, but his father has not provided money or support.

15

petition. The trial court did so on the basis of the published 2015 circuit court decision in In re E.G.S.-H., 22 Fla. L. Weekly Supp. 693b, discussed in greater detail in a later section of this opinion. The order of denial did not render any specific findings of fact or conclusions of law, and it did not specify whether it was without prejudice.

This appeal followed.

II.     Analysis

A.     Florida Appellate Decisions, 2005-2011

Florida appellate cases reported from 2005 to 2011 were receptive to immigrant juveniles petitioning for dependency. The Fourth District reversed the denial of an adjudication of dependency in F.L.M. v. Department of Children & Families, 912 So. 2d 1264 (Fla. 4th DCA 2005). The Fifth District reversed the summary dismissal of a private petition in Department of Children & Families v. K.H., 937 So. 2d 807 (Fla. 5th DCA 2006), and it reversed an adjudication of denial of dependency in L.T. v. Department of Children & Families, 48 So. 3d 928 (Fla. 5th DCA 2010). In 2011, this Court reversed, in pertinent part, the summary denial of a private petition in In re T.J., 59 So. 3d 1187 (Fla. 3d DCA 2011), relying principally on F.L.M. and L.T.

B.     Miami-Dade Circuit Court, 2013

In the case of In re M.A.S-Q. & Y.E.S-Q., 22 Fla. L. Weekly Supp. 213a (Fla. 11th Cir. Ct. Oct. 22, 2013), the circuit court adjudicated two children (siblings) dependent despite earlier doubt "as to the legitimacy of these cases." The trial judge invited and received extensive briefing by the Guardian Ad Litem Program, Regional Counsel's Office, Americans for Immigrant Justice, Florida's Children First, Florida Equal Justice Center, and the University of Miami School of Law Children & Youth Clinic. After reviewing the particular facts in the evidentiary record and applicable law, the circuit court ruled that the juveniles were dependent and entered a "best interests" order. That record included a consideration of evidence regarding conditions in the juveniles' countries of origin and the juveniles' likely deportation "absent the entry of an adjudicatory order."[12]

After considering the extensive briefing, the circuit court entered a fourteen-page, single-spaced, and closely-reasoned opinion in In re M.A.S-Q. & Y.E.S-Q., addressing a series of concerns, including venue (whether a Florida dependency adjudication can be based on occurrences outside the United States), justiciability (whether juvenile immigrant positions are actual cases or controversies, rather than "merely a mechanism used to secure a 'back door' route to naturalization"), and

---

[12] The trial court correctly recognized in In re M.A.S-Q. & Y.E.S-Q. that an adjudication of dependency and a "best interests" order do not guarantee SIJ status or naturalization. In footnote 7 of In re M.A.S-Q. & Y.E.S-Q., the circuit court noted that the juvenile "also must satisfy other federally imposed eligibility criteria." 22 Fla. L. Weekly Supp. 213a n.7.

how a child not in need of services can be "dependent." For each of these issues, the court's concern was assuaged.

The circuit court's assessment of the conflict between a finding of dependency and a "no services needed" stipulation, together with the court's concern for the ability to enter custody orders and make other post-adjudication decisions regarding the SIJ petitioners, is noteworthy:

> The Court also asked the parties to address how a child not in need of services can in fact be "dependent," and whether the Court should exercise jurisdiction in a case when it cannot carry out all of the responsibility assigned to it by Chapter 39; and in particular the responsibility to enter and enforce custody orders. The Court had difficulty comprehending how a child in need of "nothing" could be "dependent" on the Court -- and I questioned whether the Court should assume jurisdiction over a case when it could not exercise the authority vested by the legislature. The parties (and participants) have assuaged the Court's concerns.

> As for the first point, our appellate courts have uniformly concluded that a child who makes "no request for services" may nonetheless be "dependent" -- as defined by Florida Statute § 39.01(15) -- and that a finding to the contrary would encourage immigrant children to deplete state resources available for "other needy children." *See T. J. supra*, at fn. 5, citing *F.L.M., supra* at 1270. This precedent confirms that "[F]lorida Appellate Courts view immigrant children not requesting DCF services as a cost savings to the State and not something that should be held against their dependency petitioners." *See* Petitioner's Brief, p. 10. The Court is bound by this precedent and, as a result, is not permitted to take into account a child's need of services (or lack thereof) in determining whether they are in fact "dependent."

> The Court also is persuaded that jurisdiction over these cases is appropriate even though it will not always be able to exercise every responsibility assigned to it by Chapter 39. As the Petition and

18

Amicus Brief point out, the determination of whether a child is eligible for SIJS [Special Immigrant Juvenile Status] is a joint one, "reflecting the recognition of congress that states retain primary responsibility and administrative competency to protect child welfare." *See* Petitioner's Brief, p. 12, 13, fn. 15. In this unique and limited area, federal and state authorities exercise concurrent jurisdiction, with each having distinct roles and responsibilities. This Court's role and responsibility is to adjudicate whether the child is "dependent" under state law, and whether the facts support the entry of a "best interest order" -- factual findings within this Court's traditional purview.

There is no doubt that in the ordinary dependency case Chapter 39 charges this Court with the responsibility of ensuring that children under its jurisdiction are cared for in a safe and secure environment. *See, e.g.,* § 39.001(1)(a), Fla. Stat. (2013) (purpose of this chapter is "[T]o provide for the care, safety, and protection of children in an environment that fosters healthy social, emotional, intellectual, and physical development; to ensure secure and safe custody; to promote the health and well-being of all children under the state's care; and to prevent the occurrence of child abuse, neglect, and abandonment."). The Court's duty to carefully examine "placement" options commences upon acquiring jurisdiction over a child and remains until that jurisdiction is relinquished. In other words, the Court must assess the suitability of a child's placement at all stages of the proceeding.

But Congress has decided that federal immigration authorities should retain the ability to determine issues of custody and placement so long as an alien child remains in federal custody. M.A.S-Q. and Y.E.S-Q. were in federal custody at the time the Court entered its adjudicatory order. The Court therefore lacked jurisdiction to order that the children remain at [a federal Office of Refugee Resettlement Facility], and federal immigration authorities were free to place them with their uncharged Mother sans this Court's knowledge or approval.

That dependent children under the Court's jurisdiction may -- in these limited circumstances -- be moved without the Court's involvement is no doubt troubling, as one of the Court's primary responsibilities in a Chapter 39 proceeding is to ensure that the child resides in a suitable placement. On the other hand, in these unique

instances a federal agency takes on that responsibility, and the Court must assume that the child's welfare is -- and always will be -- of paramount concern. Moreover, nothing in Chapter 39 obligates the Court to exercise *all* its authority in *all* cases. <u>There are indeed circumstances where the Court is permitted to terminate supervision -- and jurisdiction -- immediately upon adjudication.</u> *See, e.g.*, § 39.521(3)(b)1, Fla. Stat (2013) (authorizing the court to place an adjudicated child in the sole custody of an uncharged parent and terminate jurisdiction).

The Court also is cognizant of, and informed by, the fact that <u>the Legislature has undeniably recognized the importance of assisting undocumented minors who may qualify for SIJS</u>. Florida Statute § 39.5075(4) obligates DCF -- or its contracted [community based care provider] -- to "petition the court for an order finding that the child meets the criteria for special immigrant juvenile status" anytime the child may be eligible. § 39.5075(4), Fla. Stat. (2005). Florida Statute § 39.5075(5), then obligates DCF -- or its contracted [community based care provider] -- to actually "file a petition for special immigrant juvenile status" with the appropriate federal authorities on behalf of the "child" within sixty (60) days after the Court determines eligibility. *Id*. at § 39.5075(5).

The Legislature also amended Chapter 39 to allow the Court to retain jurisdiction over an immigrant child with a pending SIJS petition "solely for the purpose of allowing the continued consideration of the petition and application by federal authorities," until the earlier of a final decision or the child's twenty second (22nd) birthday. § 39.013(2)(d), Fla. Stat.(2013). So there can be no doubt that the Legislature contemplated -- and has in fact compelled -- consideration of these "private petitions."

For these reasons the Court finds that it should not abdicate its responsibility to adjudicate these cases simply because it lacks the authority to make placement decisions for dependent alien children in federal custody. Congress, and our Legislature, charged this Court with the task of determining whether these children are "dependent" -- as defined by State law, and whether applying for SIJS "is in the best interest of the child." § 39.5075(5), Fla. Stat. (2005). The Court will carry out that mandate notwithstanding that its authority over alien

20

children may be slightly circumscribed during their tenure in federal custody.

22 Fla. L. Weekly Supp. 213a (emphasis added) (footnotes omitted).

In <u>F.L.M.</u>, the 2005 Fourth District case cited by the circuit court in its analysis above, DCF opposed the immigrant juvenile's petition on the grounds that such cases were "not a proper use of Florida's laws, courts, and resources devoted to helping truly-dependent, truly-needy children." 912 So. 2d at 1269. The Fourth District, however, flatly rejected that argument: "This argument is unavailing, because if a child qualifies for a declaration of dependency under our statutes, the child's motivation to obtain legal residency status from the United States Attorney General is irrelevant." <u>Id.</u>

### C.  Miami-Dade Circuit Court, 2015

In January 2015, the Miami-Dade circuit court considered a private petition brought by a young immigrant, E.G.S.-H. E.G.S.-H. was living with his father in Miami after fleeing a Central American country,[13] and he alleged that he had been abandoned by his mother shortly after birth. The court denied the petition without prejudice[14] because it concluded that the alleged abuse, abandonment, or neglect

---

[13] The reported opinion has redacted a number of specific facts to protect the juvenile's privacy.

[14] <u>In re E.G.S.-H.</u>, 22 Fla. L. Weekly Supp. 693b. So far as the opinion reflects, DCF did not investigate, appear, or take a position in the trial court. The public record does not indicate that the petition was amended or that an appeal was taken.

was too remote in time ("long stale"), and there was no allegation that the child faced any imminent or continuing risk of harm. The court found that an allegation that E.G.S.-H. had been threatened by gangs in his home country "will not support a dependency adjudication unless perhaps a parent's failure to protect a child from such abuse rises to the level of 'neglect.'" In re E.G.S.-H., 22 Fla. L. Weekly Supp. 693b.

Importantly, the decision in In re E.G.S.-H. considered dependency only under section 39.01(15)(a) (abandonment, abuse, or neglect by the child's parent, parents, or legal custodian). The juvenile immigrant was residing with his uncharged father, and the allegations of abandonment, abuse, and neglect as to the mother were found to be too remote in time. Petitioner and counsel or the court may not have focused on the significance of a single-parent finding for SIJ purposes (see detailed discussion infra Section III).

In the present case, B.R.C.M. petitioned for an adjudication of dependency as to each parent and under three criteria provided by section 39.01(15), including subparagraphs (e) and (f) as well as (a). And B.R.C.M.'s godmother is not a "legal custodian" under the definition applicable to section 39.01(15)(e).[15] In short, a

---

[15] A legal custodian is a person appointed by a court and vested with "the right to have physical custody of the child and the right and duty to protect, nurture, guide, and discipline the child and to provide him or her with food, shelter, education, and ordinary medical, dental, psychiatric, and psychological care." § 39.01(34), Fla. Stat. (2015).

summary denial of all of B.R.C.M.'s allegations by the circuit court on the basis of In re E.G.S.-H., and without other analysis, authorities, or an evidentiary hearing, was unwarranted.

### D.     In re Y.V., April 2015

In April 2015, the First District considered a circuit court order dismissing a private petition for dependency filed on behalf of a juvenile immigrant from Honduras. "The trial court dismissed the petition because the events giving rise to the grounds for dependency occurred outside the State of Florida and the court viewed the petition as an attempt to circumvent federal immigration laws." In re Y.V., 160 So. 3d 576, 577 (Fla. 1st DCA 2015).

The First District reversed the dismissal order and remanded the case for further proceedings, concluding:

> In sum, neither the geographical setting of the events alleged in the petition nor the motivation for the petition precludes Y.V. from being adjudicated dependent under the laws of the State of Florida. The proper question before the circuit court at this stage of the case under review was whether the petition establishes a prima facie case of dependency under the Florida statutes. Because we conclude that it does, we reverse the dismissal and remand for further proceedings.

Id. at 581.

### E.     This Court, July 2015

In July 2015, this Court issued two opinions addressing private dependency petitions filed on behalf of immigrant juveniles. In In re K.B.L.V., 176 So. 3d 297

23

(Fla. 3d DCA 2015), a seventeen-year-old from Honduras alleged that he had been abandoned by his father at birth. He reunited with his mother in 2013 in Florida and was residing with her. He sought an adjudication of dependency based on abandonment by only the father and a "best interests" order. His father consented to the petition, and DCF did not oppose it. Following a seven-minute colloquy with counsel, the trial court dismissed the petition on the grounds detailed in In re E.G.S.-H.—the alleged abandonment was too remote in time for the court to make a dependency adjudication.

The trial court did not hear evidence, enter findings regarding each parent, or indicate that the dismissal was without prejudice. On appeal, DCF again took no position. This Court affirmed the trial court's summary dismissal.

A specially concurring opinion in In re K.B.L.V. went further, observing that "in all probability, these cases do not reach the threshold of a case or controversy for consideration in this court or the court below," and that "our decisions in these cases are nothing but advisory opinions." 176 So. 3d at 300 (Shepherd, J., specially concurring). The specially concurring opinion introduced an additional objection to such petitions:

> Despite the long settled understanding in our federal system that "[p]olicies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress," Galvan v. Press, 347 U.S. 522, 531 (1954), the United States Congress, for reasons of its own, has decreed that our stamp of approval is a *sine*

24

*qua non* for consideration by the United States Citizenship and Immigration Services of a child's request for SJIS [sic] status and permanent residency. It is as if we are customs agents, although the federal government will make the final decision. I admit to an erosion of roles between state and federal responsibilities in our federal system in recent times. However, we are not yet colonies or territories of the United States government. We correctly decline to subordinate ourselves to the whim of the United States Congress in this case. The purpose of the dependency laws of this state is to protect and serve children and families in need, not those with a different agenda.[3]

> . . . .

> [3] Section 39.001 of the Florida Statutes provides a lengthy list of purposes, the first of which is "[t]o provide for the care, safety, and protection of children." Assistance to the United States Citizenship and Immigration Services is not one of them. But see, § 39.5075, Fla. Stat. (2014).

Id. at 301 (alterations in original).

The same day this Court issued the opinion in In re K.B.L.V., the Court affirmed the denial of another SIJ petition in In re B.Y.G.M., 176 So. 3d 290 (Fla. 3d DCA 2015).[16] In that case, a seventeen-year-old girl alleged that she fled El Salvador in 2014 after threats to her life and harassment from local gang members. She alleged that she was abandoned by her father when she was eight months old and had not seen or been contacted by him since. He never provided financial or other support.

---

[16] K.B.L.V. and B.Y.G.M. are seeking review by the Supreme Court of Florida. K.B.L.V. v. Fla. Dep't of Children & Families, No. SC15-2026 (Fla. filed Nov. 2, 2015); In re B.Y.G.M., No. SC15-2025 (Fla. filed Nov. 2, 2015).

When she was three years old, B.Y.G.M.'s mother left for the United States. B.Y.G.M. was reunited with her mother in Homestead, Florida, and was living with her mother when she filed the petition. She sought a finding of dependency as to the father and a "best interests" order. The trial court heard testimony from B.Y.G.M. and her mother, and denied the petition on the grounds that (a) the abandonment was too remote in time and (b) her mother is capable of providing B.Y.G.M. supervision and care. B.Y.G.M. sought no services from DCF, and DCF did not investigate, or take a position regarding, the allegations in the petition.

In B.Y.G.M.'s appeal, DCF again took no position. This Court affirmed the trial court's findings and the denial of the petition. Once again, a concurring opinion addressed DCF's failure or refusal to take a position in these cases (and to alert the Court "to other state authority germane to our decision")[17] and expressed the view, with regard to SIJ petitioners, that "[t]here is no reason for this court to succumb to those who would misuse our law." Id. at 296 (Shepherd, J., concurring).

---

[17] However, the New Jersey case cited by the specially concurring opinion regarding the rejection of an immigrant juvenile's petition, H.S.P. v. J.K., 87 A.3d 255 (N.J. Super. Ct. App. Div. 2014), was later reversed by the Supreme Court of New Jersey in an opinion discussed in greater detail below, H.S.P. v. J.K., 121 A.3d 849. That Court remanded the case to the trial court for a new hearing and detailed findings. See supra Section III.

Although these two panel decisions of our Court are binding on the panel in this case as to issues of law, petitions for dependency turn on their particular facts and the totality of circumstances. See In re M.F., 770 So. 2d 1189 (Fla. 2000). Determinations of abandonment are fact-specific and are not reweighed if based on testimony and evidence at trial. J.C.J. v. Heart of Adoptions, Inc., 989 So. 2d 32, 35 (Fla. 2d DCA 2008) (citing In re Adoption of Baby E.A.W., 658 So. 2d 961, 966-67 (Fla. 1995)). The temporal remoteness of abandonment, and long-term lack of contact by a parent, is not always a bar to such a claim. See, e.g., V.C.B. v. Shakir, 145 So. 3d 967 (Fla. 4th DCA 2014) (concluding the child was abandoned based on four years without parental contact; five years without financial support); M.A. v. Dep't of Children & Families, 814 So. 2d 1244 (Fla. 5th DCA 2002) (affirming the trial court's finding of abandonment based on five years with only marginal efforts to maintain contact, while making no provisions for the children's welfare). Neglect and abuse are similarly fact-intensive determinations.

The facts relied upon by the trial court and this Court in In re K.B.L.V. and In re B.Y.G.M. are markedly different than those at issue in B.R.C.M.'s case. The majority's opinion in the present case concludes that a child abandoned by both parents and presently living with a godmother has not been abandoned for purposes of Chapter 39. But as the First District held in In re Y.V., such allegations present prima facie grounds for dependency under sections

39.01(15)(a) and (e), and "the only reason [the petitioner] is not at imminent risk is because a responsible adult is caring for him on a voluntary basis." 160 So. 3d at 579. Nevertheless, the majority approves the trial court's summary denial of B.R.C.M.'s petition without an evidentiary hearing or findings.

### F. Citation PCAs

A series of five summary adjudications by the Miami-Dade circuit court followed, with per curiam affirmances (PCAs) by this Court citing the July 2015 decisions in In re K.B.L.V. and In re B.Y.G.M. Four of these are part of an introductory string cite in the majority opinion in this case, but in my view each of the underlying cases should be considered on its own unique, sworn allegations and an evaluation by DCF, and should culminate in specific adjudicative findings, rather than a summary denial.

M.J.M.L. v. Department of Children & Family Services, 170 So. 3d 931 (Fla. 3d DCA 2015), affirmed the summary denial of a petition filed on behalf of a thirteen-year-old immigrant juvenile from Honduras. The written order denying M.J.M.L.'s petition stated only that it was denied "based on the fact that there is a parent with the child residing in Dade County."[18]

---

[18] The order indicates reliance on a circuit court order from another case. From the transcript and chronology, the intended reference was to the circuit court opinion in In re E.G.S.-H.

28

Similarly, In re J.A.T.E., 170 So. 3d 931 (Fla. 3d DCA 2015), the private petition was summarily denied without elaboration or findings, and with a citation to In re E.G.S.-H. On appeal, DCF filed a "Notice of the Department's Position," stating that the appeal concerned a private dependency petition, and "The Department did not assert its party status, did not appear as a litigating party in the trial court, and did not take a position in the underlying proceedings on the issue of whether [J.A.T.E.] proved the statutory requirements for dependency."

The third citation PCA issued the same day as those in M.J.M.L. and In re J.A.T.E. was in D.A.O.L. v. Department of Children & Families, 170 So. 3d 927 (Fla. 3d DCA 2015). The written order reflects a denial without prejudice based on S.H. v. Department of Children & Families, 880 So. 2d 1279 (Fla. 4th DCA 2004),[19] and In re M.A.S-Q. & Y.E.S-Q., 22 Fla. L. Weekly Supp. 213a. DCF filed a notice of taking no position in this Court in D.A.O.L.'s subsequent appeal.

In a fourth citation PCA, In re F.J.G.M., 40 Fla. L. Weekly D1908 (Fla. 3d DCA Aug. 12, 2015), this Court affirmed a summary dismissal with citations to In re B.Y.G.M. and In re K.B.L.V.[20] The trial court order denied the petition on the

[19] S.H. involved a petition by a sixteen-year-old immigrant from Guatemala establishing only "that S.H.'s parents sent him to live with his uncle" to obtain work in the United States and support his family in Guatemala. 880 So. 2d at 1280. "These facts alone would not as a matter of law constitute abandonment." Id. at 1280-81.

[20] The citation PCA in In re. F.J.G.M. is the subject of a pending motion for rehearing and rehearing en banc.

basis of the circuit court's opinion in <u>In re E.G.S.H.</u> and the opinions of this Court in <u>In re B.Y.G.M.</u> and <u>In re K.B.L.V.</u>

Finally, in <u>In re D.A.M.</u>, No. 3D15-1154 (Fla. 3d DCA Oct. 28, 2015), the trial court summarily denied a petition filed by two immigrant minors, citing the circuit court order in <u>In re E.G.S.-H.</u> as the legal basis for the ruling. This Court entered an affirmance citing <u>In re B.Y.G.M.</u> and <u>In re. K.B.L.V.</u>

In each of these five PCAs, the trial court had summarily denied the immigrant juvenile's petition without an evidentiary hearing and without issuing any findings of fact.

G.    <u>Summary Regarding the 2015 Dispositions of SIJ Petitions</u>

From the elaboration of rulings in 2015 in this district (<u>see</u> <u>supra</u> Sections II.E. and II.F.), it is apparent that (a) DCF has previously treated SIJ petitions as inappropriate for pre-hearing investigation or legal analysis at a hearing, and (b) the circuit court and this Court have concluded that private petitions by immigrant juveniles are generally appropriate for summary denial, despite the more deliberate consideration previously afforded the SIJ petitioners in 2013 in <u>In re M.A.S-Q. & Y.E.S-Q.</u> and in prior opinions by the district courts of appeal.

This circumstance is exacerbated by the rules of procedure requiring the circuit court to expedite hearings and dispositions on dependency petitions,[21] and

---

[21] Fla. R. Jud. Admin. 2.250(a)(1)(F).

requiring this Court to expedite the appeals in such cases.[22]  The short time between our citation PCAs and the next case in the trial court may seem to endorse facial review and summary denial of subsequent petitions by immigrant juveniles.

But although the particular petitions ruled upon by the circuit court and this Court in In re B.Y.G.M. and In re K.B.L.V. may have warranted denial, those trial and appellate rulings did not, and should not be read to, justify a blind eye by DCF and to invite categorical, summary denial and per curiam affirmances in all petitions by immigrant juveniles in this district.  This trend seems to reflect a belief or conclusion that the petitioners are only seeking immigration relief, not state assistance following abuse, abandonment, or neglect, such that the immigrant petitioners are not entitled to adjudicative findings under Chapter 39, Florida Statutes.

Despite the distinguishing facts in B.R.C.M.'s petition and the fact-intensive character of dependency determinations, this Court's opinions in In re B.Y.G.M. and In re K.B.L.V. apparently are now considered by some to support a threshold, categorical rejection of immigrant juveniles' petitions.  The resulting circuit court denial orders lack any findings amenable to meaningful appellate review.  And, viewed cumulatively, the recent spate of summary denial orders in the trial court and per curiam affirmances in this Court suggest a categorical rejection of such

---

[22] Fla. R. App. P. 9.146(h).

31

petitions rather than the usual individualized evidentiary hearings and written findings of fact.

As already noted, there is also a view that the federal government and its immigration authorities have unfairly thrust these petitions on DCF and our state courts by creating the SIJ process—a view that SIJ petitions are in effect an unfunded mandate to a DCF that already works hard but strains to care for our state's "truly" abused, abandoned, and neglected children. To address these views and provide a practical way forward, we can benefit from a recent decision from another state.

III.     Individualized Consideration and Findings: H.S.P. v. J.K.

In the case of H.S.P. v. J.K., 121 A.3d 849 (N.J. 2015), the Supreme Court of New Jersey addressed two separate petitions filed on behalf of immigrant juveniles. In the first, a petition was filed by an uncle (H.S.P.) on behalf of his seventeen-year-old nephew, M.S. M.S., a citizen of India lacking immigration documentation, sought a declaration in the state "Family Part" that he had been abandoned and neglected by each of his parents. In New Jersey, the "Family Part" is the trial court division corresponding to the Juvenile Division of the Miami-Dade circuit court.

The Family Part conducted a hearing and declined to enter the predicate SIJ findings because it concluded that neither of M.S.'s parents had abandoned or

neglected M.S.  The Family Part "did not reach the question of whether it would be in [M.S.'s] best interests to remain in the United States or be returned to India." Id. at 853.  The Appellate Division affirmed the Family Part's conclusion that M.S. had not been abandoned or neglected by his mother, reversed the conclusion as to abandonment by his father, and affirmed the Family Part's refusal to enter a "best interests" order.

In the second petition reviewed by the Supreme Court of New Jersey in the same opinion, a mother filed on behalf of her daughters, J.S.G. (then fifteen years old) and K.S.G. (then twelve years old).  All were citizens of El Salvador. Approximately six years before the petition was filed, the mother left for the United States, leaving the children in the care of their father and grandmother.  The petition alleged that the father was murdered by members of a gang in El Salvador eleven months before the petition was filed.  At the age of twelve, the older daughter was raped by a member of a gang, and she later attempted suicide.  The girls entered the United States via Mexico in 2013, were transferred by immigration authorities to Chicago, and ultimately were released by the Office of Refugee Resettlement to the care of their mother in Elizabeth, New Jersey.

The Family Part found that it was not in the juveniles' best interests to return to El Salvador, but also that there was "no basis under state law to suggest that [the mother] had abused, neglected, or abandoned the children."  Id. at 855.  This order

was allowed to be directly certified to the Supreme Court of New Jersey and the case was consolidated there with the first of the two immigrant juvenile cases (involving the juvenile from India, M.S.).

The Supreme Court of New Jersey received amicus briefs from the American Friends Service Committee, Kids in Need of Defense, the Young Center for Immigrant Children's Rights, and a number of New Jersey law school professors specializing in family and immigration law. The Supreme Court of New Jersey concurred with the New York courts that SIJ petitions represent "a unique hybrid procedure that directs the collaboration of state and federal systems," quoting In re Marisol N.H., 979 N.Y.S.2d 643, 645 (N.Y. App. Div. 2014); and with the California courts that "[t]he SIJ statute affirms the institutional competence of state courts as the appropriate forum for child welfare determinations regarding abuse, neglect, or abandonment, and a child's best interests," quoting In re Y.M., 144 Cal. Rptr. 3d 54, 68 (Cal. Ct. App. 2012). H.S.P., 121 A.3d at 857, 859.

The Supreme Court of New Jersey also focused on the language of the federal SIJ statute regarding adjudicative findings as to "1 or both" parents. Although the interpretation of the statute itself "is exclusively the province of the federal government," the Court recognized that findings as to each of a petitioning juvenile's parents could be important to the federal authorities considering the

juvenile's later I-360 SIJ petition.  <u>Id.</u> at 860.[23]  The Court provided clear guidance

to New Jersey trial courts relating to such petitions:

> In an effort to ensure that factual findings issued by New Jersey courts provide USCIS with the necessary information to determine whether a given alien satisfies the eligibility criteria for SIJ status, we instruct courts of the Family Part <u>to make separate findings as to abuse, neglect, and abandonment with regard to both legal parents of an alien juvenile</u>. For example, the Family Part should first determine whether reunification with one of the child's parents is not viable due to abuse, neglect, or abandonment. Regardless of the outcome of that analysis, the court should next conduct the same analysis with regard to the child's other legal parent. <u>By requiring the Family Part to make independent findings as to both of the juvenile's parents, we ensure that USCIS will have sufficient information to apply 8 U.S.C.A. § 1101(a)(J)(27) as it sees fit when a juvenile subsequently submits the Family Part's order to USCIS in support of an application for SIJ status</u>. That is the role Congress envisioned for the juvenile courts of the fifty states, and that is the process that should be followed by the Family Part.

<u>Id.</u> (emphasis added).

The Supreme Court of New Jersey reversed the Appellate Division's

judgment and remanded both petitions to the Family Part for further hearings and

findings in accordance with the Supreme Court's opinion.

IV.    <u>Conclusion</u>

---

[23] The Court cited an article addressing this point, Meghan Johnson & Kele Stewart, <u>Unequal Access to Special Immigrant Juvenile Status: State Court Adjudication of One-Parent Cases</u>, 16 A.B.A. Child. Rts. Litig., no. 4, at 8 (2014), http://www.americanbar.org/content/dam/aba/publications/litigation_committees/childrights/summer2014.authcheckdam.pdf.  <u>H.S.P.</u>, 121 A.3d at 858-59.

That B.R.C.M.'s petition is unusual in comparison to the petitions filed on a daily basis by DCF is without question. That B.R.C.M.'s petition floats on an undercurrent of polarized views regarding national immigration policy[24] is also without question. But I submit that DCF should evaluate the allegations of each petition, and Florida circuit courts should enter findings of fact and conclusions of law that address each juvenile petitioner's individual claims. If DCF alleges, and the circuit court concludes, that the petition fails to state a prima facie case, the petitioner should be allowed to amend, as the rules provide. If the petition states a prima facie case, the petitioner should be permitted to introduce evidence in support of his or her claims, and the court should enter specific adjudicative findings responsive to the issues presented by the petition and the evidentiary record. When such relief is sought, the circuit court should determine (and if that determination is appealed, this Court should review) the dependency claims separately as to each of the petitioner's parents.

---

[24] "While this court is sympathetic to the plight of alien minors seeking the opportunity of a better life in the United States, the role of the trial judge is not to set immigration policy or to decide whether, as a humanitarian gesture, any particular alien minor should be permitted to stay in the United States." O.I.C.L. v. Dep't of Children & Families, 169 So. 3d 1244, 1250 (Fla. 4th DCA 2015), review granted, No. SC15-1570 (Fla. Oct. 30, 2015) (oral argument set for Feb. 2, 2016).

"Here we have another unopposed petition to have a minor child who has illegally crossed the border of the United States declared dependent on the court for the sole purpose of helping the child obtain legal residency status in the United States." In re K.B.L.V., 40 Fla. L. Weekly at D1623 (Shepherd, J., specially concurring).

In this way, our dependency courts can consider what Congress has invited—not ordered—them to consider (because of the state dependency courts' superior expertise), and yet stay out of final immigration rulings. And more importantly, immigrant children may obtain what other children in Florida routinely obtain in dependency cases—an investigation and individualized adjudication of their exigent circumstances. The circuit court's 2013 order in In re M.A.S-Q. & Y.E.S-Q. afforded careful, individualized adjudication of the immigrant juveniles' allegations. The summary denial of B.R.C.M.'s petition in the present case, in contrast, did not.

I would also certify our opinion in this case as being in express and direct conflict with the decisions of the First District in In re Y.V., 160 So. 3d 576 (Fla. 1st DCA 2015); the Fourth District in F.L.M. v. Department of Children & Families, 912 So. 2d 1264 (Fla. 4th DCA 2005); and the Fifth District in Department of Children & Families v. K.H., 937 So. 2d 807 (Fla. 5th DCA 2006), and L.T. v. Department of Children & Families, 48 So. 3d 928 (Fla. 5th DCA 2010).

Finally, I would certify the following to the Supreme Court of Florida as a question of great public importance:

REGARDING PETITIONS FOR DEPENDENCY FILED ON BEHALF OF IMMIGRANT JUVENILES UNDER CHAPTER 39, FLORIDA STATUTES, IS SUMMARY DENIAL OF SUCH PETITIONS APPROPRIATE IF THE PETITIONER IS LIVING IN

FLORIDA WITH A FAMILY MEMBER OR VOLUNTEER APPROVED BY THE OFFICE OF REFUGEE RESETTLEMENT?

B.R.C.M. may be "perceived to be a defector from poverty,"[25] but that should not exclude him from adjudication as a dependent juvenile under Chapter 39 if the evidence supports such findings. The order below should be reversed and remanded for further proceedings.

For these reasons, I respectfully dissent.

---

[25] Fla. Bd. of Bar Exam'rs re Question as to Whether Undocumented Immigrants are Eligible for Admission to The Fla. Bar, 134 So. 3d 432, 444 (Fla. 2014) (Labarga, J., concurring).